762 So.2d 229 (2000)
Moses DAVIS, Jr.
v.
LOUISIANA POWER & LIGHT COMPANY.
Randy Alexander
v.
Louisiana Power & Light Company, a/k/a An Entergy Company.
Nos. 00-CA-13, 00-CA-14.
Court of Appeal of Louisiana, Fifth Circuit.
May 17, 2000.
*231 Tagart, Morton, Ogden, Staub, Rougelot & O'Brien, LLC, Charlton B. Ogden, III, John J. Zvonek, New Orleans, La. Attorney for Appellant Entergy Louisiana, Inc.
William P. Connick, Elliot M. Lonker, Metairie, Louisiana, Attorney for Appellee/Intervenor The Parish of Jefferson.
Raymond A. Pellteri, Jr., New Orleans, Louisiana, Steven K. Faulkner, Jr., Harahan, Louisiana, Attorneys for Appellee Moses Davis, Jr.
Court composed of Judges EDWARD A. DUFRESNE, Jr., JAMES L. CANNELLA and SUSAN M. CHEHARDY.
CANNELLA, Judge.
Defendant, Entergy Louisiana, Inc. (formerly Louisiana Power and Light Company) appeals a judgment in favor of Plaintiffs, Martha and Moses Davis, in a case of personal injury by electrocution. We affirm in part and amend in part and affirm as amended.
On April 21, 1993, Moses Davis, a seventeen year employee of the Jefferson Parish Sewerage Department (JPSD), was foreman of a crew that had been dispatched to clean out a wet well located adjacent to a sewer lift station near Layman and Church Streets in the Glen Della Subdivision in Jefferson Parish. An electrical distribution line owned by Defendant runs directly above the well. The line carries 7800 volts of electricity via an uninsulated aluminum wire. The line was installed in 1967 and the well in 1969, both to service the subdivision.
During the clean-out procedure, a clamp or ring, part of the vacuum device used to suction water from the well, fell off the vacuum, landing at the bottom of the well. Moses Davis attempted to retrieve the part with a long-handled rake which is used by the crew for various purposes. As he slowly inched the rake and clamp up, the rake allegedly contacted the overhead wire, causing him to suffer electrical burns.
As a result of the accident, Moses Davis and his then wife, Martha Davis, filed suit in Orleans Parish.[1] That suit was transferred to Jefferson Parish and consolidated with a suit by Randy Alexander (Alexander), who was injured in the same incident. Alexander settled his claim prior to trial. On April 14, 1994, the Parish of Jefferson, Moses Davis' employer, filed an intervention to recover workers' compensation benefits which had been paid.
A bench trial was held on July 20, 21, 22, and August 19, 1999. Prior to the close of trial, on August 6, 1999, Plaintiffs filed to re-open their case to present newly discovered evidence. During the week of July 26, 1999, Plaintiffs, for the first time, encountered a Parish of Jefferson electrician, Drew Hosli (Hosli), who was sent to the scene of the accident the day after the accident to measure the height of the electrical line. This information had not been provided to Plaintiffs prior to the trial and Hosli's report had disappeared. Over Defendant's objection that the height of the line had been stipulated, the trial judge admitted the testimony.
On September 21, 1999, the trial judge rendered judgment with reasons, in favor of Plaintiffs. He awarded Moses Davis $175,000 in general damages, unpaid medical expenses of $500, and $9,188.88 in lost wages. Pursuant to a stipulation, the trial judge awarded the Intervener $32,155.24. The Intervener's award was assessed against Defendant. The trial judge further awarded Martha Davis $2,000 for her loss of consortium.
On appeal, Defendant contends that the trial judge erred in finding that the electrical distribution line was substantially *232 below the minimum vertical clearances required under the National Electrical Safety Code (NESC). Second, it argues that the trial judge was clearly wrong in finding it 100% liable. Third, Defendant contends that the trial judge erred in allowing testimony to rebut trial stipulations. Fourth, Defendant asserts that the trial judge abused his discretion in awarding excessive general damages. Fifth, Defendant asserts that the trial judge erred in awarding the Intervener its reimbursement claim against Defendant.

STIPULATIONS
We first address Defendant's assertion that the trial judge erred in admitting the testimony of Hosli to rebut trial stipulations relative to the height of the power line. Defendant first argues that the trial judge erred in finding that the electrical line was less than 18.5 feet, the minimum requirement for clearances for non-restricted areas under the NESC. Defendant contends that the finding was inappropriate because it contradicts a stipulation made on the third day of trial that the line was 20.4 feet above the wet well.
The parties made several stipulations during trial. One stipulation was that the depth of the well was 18 feet. It is clear in the record that the parties intended to stipulate to that as a fact. Defendant asserts that the parties also stipulated that the line was over 20 feet high. However, Plaintiffs argue that the stipulation was not that the height of the line was over 20 feet, but was in lieu of the testimony of Defendant's witness to that effect. The trial judge agreed and allowed Plaintiffs to rebut the evidence of the height of the line with the testimony of Hosli, who was discovered after Plaintiffs rested their case.
The stipulations that relate to the issue are:
Mr. Ogden:
Number 1 would be the introduction into evidence of Defendant's Exhibit Number 31(sic), which is the survey of the area in question, performed by Landmark Surveying, and Jeffrey Ruello was the professional land surveyor, and the survey shows what the condition of the area was and the height of the lines was, when he tookdid the survey and drawn April 6th, 1994....
R.p.11.
Mr. Ogden:
We would also stipulate that the poles and the cross-arms and the electric lines that were out there at the time of the incident, were as they were, the same materials as originally constructed, and they were not changed or altered in any way by LP & L or anyone else....
R.p.12
Following these comments, Plaintiffs' counsel stated that the stipulations were accepted. However, after another stipulation concerning the date that the transformers were placed on the site, Plaintiffs' counsel stated: "Oh, yeah. Well, we accept the stipulation.... I mean, rather than you putting a witness on to say it."
We find that the first stipulation was clear that the parties stipulated to the results of the survey taken in 1994, one year after the incident. However, it is unclear in the second stipulation as to whether it referred to the condition of the line between the time it was installed in 1969 and the date of the accident, or between the date of the accident and the date that the survey was taken in 1994. We understand it as referring to the period that the line was installed and the date of the accident. However, since it is ambiguous, it cannot bind either party. Furthermore, viewing it with the other stipulations, it appears that it was made in lieu of testimony, as found by the trial judge. Thus, we find that the trial judge did not err in admitting the testimony of the rebuttal witness.

NEGLIGENCE
La. C.C. art. 2315 provides that every act whatever of man that causes damage to another obliges him by whose *233 fault it happened to repair it. La. C.C. art. 2316 states that every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill. Plaintiffs bear the burden of proving every element of their case by a preponderance of the evidence, that is, whether it is more likely than not, that the harm was caused by the tortious conduct of the Defendant. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). In determining whether Defendant's conduct is negligent, the courts apply the duty/risk analysis. Todd v. State Through Dept. of Social Services, Office of Community Services, 96-535 (La.App. 5th Cir. 11/26/96), 685 So.2d 313, 317; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). This requires the following findings:
1. That the conduct was a cause in fact of the resultant harm;
2. That a defendant owed plaintiff a duty;
3. That the duty owed was breached by a defendant;
4. That the risk of harm was within the scope of the breached duty.
Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991).
Whether a defendant owes a plaintiff a legal duty is a question of law. Todd, 685 So.2d at 317.
"In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the plaintiffs harm and the defendant's conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the defendant's activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving."
Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 233. Once the court finds that a duty exists, the trier of fact must decide if defendant breached the duty. Id. at 233-4. This is a question of fact. Todd, 685 So.2d at 317.
To determine whether a particular risk is unreasonable, the benefit of the thing must be balanced with its potential for harm and the cost of prevention. Socorro, 579 So.2d at 939. The burden is on the plaintiff to prove that the thing poses an unreasonable risk of harm. Killough v. Bituminous Cas. Corp., 28329 (La.App. 2nd Cir. 5/8/96), 674 So.2d 1091, 1097.

EVIDENCE
Defendant argues alternatively that, prior to the testimony of the rebuttal witness, the two expert witnesses testified that the line was above 20 feet above the ground. Defendant further asserts that there was no evidence of prior problems with low lines at that location or anywhere in Jefferson Parish, and neither Moses Davis nor his co-worker, Alexander, testified that the line was strung unusually low. The only difference between this electrical distribution line and others in Jefferson Parish is that this one is directly over the wet well, whereas the others are approximately five feet away.
Moses Davis testified that wet wells are located all over Jefferson Parish. They are regularly cleaned with vacuum equipment to remove debris that could be sucked into the sewer system. As ususal, prior to commencing the work, sections of the vacuum were connected on the ground. After the suctioning process was completed, the workers started to raise the vacuum. While doing so, an iron clamp fell from the vacuum to the bottom of the well. This had to be removed to prevent it from being sucked into the sewer system. The workers obtained a rake to retrieve the clamp. The rake they used is comprised *234 of five sections, approximately four feet each, that could be screwed together. In this instance, the rake had already been put together because it had been used to plug the line across the street.
Because one of the sections could not be used due to a problem, the rake was too short to reach the bottom of the hole. As a result, Moses Davis lay on his side with his head in the well and manipulated the rake to hook the ring clamp. He remembers getting to his knees and crouching as he raised the rake, and that the rake was resting on his shoulder at an angle away from the well to avoid any contact with the overhead lines. He does not remember anything else until the hospital.
Moses Davis stated that the rake was 16 feet long or less and thought that the head of the rake was approximately 6 inches. However, calculating the section lengths and the rake head, the rake had to be at least 16.5 feet, but no more than 18 feet. Moses Davis testified that he was fully aware of the overhead electrical wires, had received safety training, including instructions related to live electrical wires, and was responsible for the safety of his crew.
Alexander testified that several unsuccessful attempts were made by some of the other workers before Moses Davis successfully hooked the clamp. He also stated that the rake was too short to reach the bottom of the well. Alexander stated that, when Moses Davis hooked the clamp, he raised the rake slowly because it would have fallen back into the well. As the rake was being raised from the well, Alexander heard a frying noise. He saw lightning running down the light pole that hit Moses Davis. When it did, Moses Davis caught Alexander's hand, transferring some of the voltage to him. Alexander was able to jump away and Moses Davis was knocked down by the electrical jolt.
Alexander testified that it was safer to connect the rake together while it was laying on the ground, rather than as it was lowered into the well, as suggested by Defendant. He said that this prevented pieces of the rake from falling into the well that could be sucked into the sewer system.
The only actual measurements taken of the line were performed by Hosli, the Parish of Jefferson's electrician, the day after the accident, and by Defendant one year later. The Defendant's survey shows that the line was over 20 feet high. However, the day following the accident, Hosli determined that the height was less than 18 feet. Hosli stated that he measured the line by using a "pvc" pipe marked at the 18 feet level, which he held up close to the powerline. Although he submitted a report to the Parish of Jefferson, they were unable to find it.
Vincent Goodman (Goodman), a forensic and electrical engineer, examined the scene in February of 1999. He looked at photos taken in 1995 and 1999, which show that the transformer pole with three lines passing over the sewer well was seriously tilted to one side. He considered that condition to be a hazard that should have been, but had not been, corrected by Defendant. He thought that this problem could cause the line to sag on the side near the sewer station. Goodman testified that he did not measure the pole when he went to the scene. He accepted Defendant's assertion that the line was over 20 feet high. However, Goodman testified that the line was unsafe despite the height because it was uncovered and because it was directly over a work area. He disagreed with Alton Ridge, Defendant's senior engineer, who testified that the line was sufficiently insulated by isolation and air (the height of the line). Goodman stated that because of the known activity under the line, it should have been covered, or the line raised 4 to 5 feet, or a diverting arm installed to move the line away from the well. Although Goodman recognized that the NESC handbook[2], relied on in his work, recommends the 18.5 feet height in *235 this type of geographical location, he stated that the recommendation is based on there being no activity under the line. Thus, Defendant cannot rely on the NESC standard, if the standard does not provide a safe clearance. He further testified that an inexpensive solution in these cases is to install an alley-arm to direct the line 6 to 8 feet away from the well.
Goodman also disagreed with the recommendation in the NESC handbook that insulating covers should only be placed on lines where necessary to protect the lines from trees and to prevent outages, but not to protect the public, because it engenders a false sense of security. He agreed with the handbook that an insulation cover can potentially cause the lines to sag, because of the extra weight. Further, he agreed that touching a wet, covered line would cause a shock, a possible result contemplated by the handbook, if the public thought the line was insulated. However, he stated that even if someone came in contact with a wet insulated line, the person would not receive electrical burns and would survive the contact, unlike most instances in which contact is made with an uninsulated line. Thus, he concluded that insulated lines are safer and should be installed wherever it is foreseeable that there will be work conducted under or near the lines.
Goodman also noted that although the NESC sets out requirements for the installation of electrical lines, it also states that the utility should perform regular inspections, to correct deficiencies, which Defendant does not do, and should take whatever safety measures are necessary in an area considering the individual conditions that exist in proximity to the lines. Although he did not know the exact height of this line, Goodman stated that Moses Davis had to make contact with it in order for the electrocution to occur. He stated that the electricity would not have arced two feet, if the line was at 20 feet and the rake was at 18 feet.
Frederick Brooks (Brooks), Defendant's expert, testified that in order for Moses Davis to have survived the jolt of 7500 volts of electricity, the head of the rake held by him must have touched the manhole cover. He also stated that this is supported by Moses Davis not receiving exit burns through his feet. Brooks testified that the accident could have been avoided if Moses Davis had not come within 10 feet of the line, or had pulled the rake out in sections, rather than in one piece, or had contacted Defendant for assistance in working with the "high reach" rake.

STANDARD OF REVIEW
On appellate review, the court's function is to determine whether the trial judge's findings were clearly wrong or manifestly erroneous. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Brown v. Seimers, 98-694 (La.App. 5th Cir. 1/13/99), 726 So.2d 1018, 1021; Rosell v. ESCO, 549 So.2d 840 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Brown, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Brown, 726 So.2d at 1021; Stobart, 617 So.2d at 882. Only where the documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility *236 determination. Brown, 726 So.2d at 1021; Rosell, 549 So.2d at 844-45.
Defendant contends that Hosli's testimony was not credible because Defendant produced evidence that it had made no changes to the line since the accident. Since the survey showed the height of the line to be 20 feet, it concludes that the line had to be over 20 feet and thus, Moses Davis had to have raised the rake, in disregard for his own safety, in order to make contact. The trial judge rejected this conclusion. He considered the uncontradicted evidence that Defendant did not have any regular inspections of the lines for any defects, the uncontradicted evidence that the pole had been noticeably leaning for several years, that meter readers went regularly to the site giving Defendant constructive or actual knowledge of the defect in the height of the line, that the well was 18 feet deep, and the uncontradicted evidence showing that the rake was no longer than, and possibly less, than 18 feet. The trial judge determined that the head of the rake touched the manhole cover, otherwise, Moses Davis would not have survived the jolt of electricity. He further found that there were only two ways which the rake could have touched the line, if the line was below 18 feet or if Moses Davis raised the rake several feet into the air. Since there was no evidence that Moses Davis raised the rake into the air, the trial judge determined that the line could not have been over 20 feet at the time of the accident and that the line had to be below the minimum height. We also note that it would have been unreasonable for the crew to have dismantled the rake, section by section when it was being raised, as urged by Defendant, because the clamp would have fallen back into the well. The crew performed the operation in the only manner available, since placing a man into the well is extremely unsafe due to sewer gases in the well.
Although the trial judge mistakenly stated that the NESC minimum height requirement in this area was 18 feet, rather than 18.5 feet, we find this error is harmless and does not refute the other evidence. A review of the evidence reveals no manifest error by the trial judge in his determination that the line was hanging below the required minimum height and that this defect constituted negligence which caused the injury to Moses Davis.

COMPARATIVE FAULT
Next, Defendant asserts that the trial judge erred in finding it 100% at fault.
The manifest error standard of review applies to the trial court's apportionment of percentages of fault. Lapeyrouse v. Wal-Mart Stores, Inc., 98-547 (La.App. 5th Cir. 12/16/98), 725 So.2d 61, 65, writ denied, 99-C-0140 (La.3/12/99).
In this case, the trial judge found that Moses Davis was aware of the power line and its dangers, but concluded that he was entitled to rely on the line being maintained at the appropriate safe height. Thus, he found that Moses Davis' actions were not a contributing factor in the accident. We agree. Moses Davis testified that he held the rake on his shoulder at an angle shortly before contact with the line in an attempt to keep the rake away from the line. Further, there is no evidence that he raised the head of the rake above the level of the ground. Thus, we find no manifest error in the trial judge's finding that Moses Davis' conduct did not contribute to the accident.

DAMAGES
The standard for the review of damage awards is whether, after an articulated analysis of the facts, the court finds the trial judge abused his/her great discretion. Bostwick v. M.A.P.P. Industries, Inc., 97-791 (La.App. 5th Cir. 12/30/97), 707 So.2d 441, 448; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of the injured plaintiff. Bostwick, 707 So.2d at 448; Theriot, 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar *237 to the particular case and plaintiff, an appellate court may conclude that the award is inadequate (or excessive). Bostwick, 707 So.2d at 448; Theriot, 625 So.2d at 1340. Only then is a resort to prior awards appropriate, and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Bostwick, 707 So.2d at 448; Theriot, 625 So.2d at 1340.
Moses Davis was transported to West Jefferson General Hospital following the accident. Dr. Frank DiVincenti, a general surgeon, began treating him in the emergency room. Dr. DiVincenti testified that Moses Davis sustained small burns due to electrical current passing through his body, causing burns to 3 to 5% of his total body. His scalp, right arm and right calf were affected. Moses Davis remained in the hospital for seven days. During that time, twice a day the burns were debrided, a procedure which removes the scabs and unhealthy tissue by scraping it away until the area bleeds. This was done without anesthesia, although Moses Davis was provided with pain medication while in the hospital. Nonetheless, according to Dr. DiVincenti, debridement is extremely painful. He was also given antibiotics. While in the hospital, Moses Davis complained about chest pain. A cardiologist examined him and concluded that it was muscle spasms from the voltage jolt. After his discharge, he underwent debridement for another 12 days on an outpatient basis, for a total of 26 treatments. After 12 days, the outside of the burns were healed, but the doctor testified that it takes six months to one year for the wounds to heal internally. Since the burns were second degree, grafts were not necessary. However, Moses Davis now has permanent, disfiguring scars from the burns.
Moses Davis remained under treatment with Dr. DiVincenti until July of 1996. During that time, he was sensitive in the scar areas, complained of right shoulder pain, sexual dysfunction, groin pain, problems climbing ladders and headaches. The doctor referred him to a urologist for his groin problems and to an orthopedist for the shoulder complaint. A Magnetic Imaging Resonance (MRI) test of the shoulder was normal. However, Dr. DiVincenti stated that Moses Davis' complaints were related to the jolt of the electricity going through his body. The shoulder injury was secondary to the electrocution, either when he fell, or because he strained it during the event. Moses Davis was provided elastic Jobst bandages to cover the arm and leg scars to prevent them from thickening. He had to follow the protocol even after the areas healed to prevent the burn areas from breaking down. The doctor noted that Moses Davis will be more susceptible to chemical burns, sunburn, and harsh detergents because of the accident. The doctor stated that he reached maximum medical improvement after one year.
Moses Davis returned to light duty work in August of 1993, four months after the accident. He was not able to resume his regular work schedule until March 7, 1994, almost one year later.
Dr. DiVincenti testified that Moses Davis did not remember being struck by the voltage. Although his burns were relatively minor, he stated that the electrocution was not a minor event. The doctor stated that his body received 8,000 volts, which could have killed him. He noted that a person can have minor burns from high voltage electrical current, yet die from the event due to cardiac arrest.
Dr. Phillip Farris treated the right shoulder injury for a year after the accident. He testified that this is a typical electrical shock injury, which causes symptoms similar to a rotator cuff tear. He stated that the electric current probably caused an impingement syndrome, or bursitis. Dr. Farris noted that Moses Davis will continue to have symptoms in his shoulder as a result of the shock to it.
*238 Moses Davis had pre-existing problems, including stomach and chest pains, headaches, impotence and left shoulder bursitis. Prior to the accident, he complained to Dr. James Marra, his primary care physician and internal medicine specialist, of a "laundry list" of symptoms. The trial judge found that these were exacerbated by the electrical shock.
Moses Davis was diagnosed with anxiety disorder by Dr. Linda Dietz, who stated that it was most likely a result of the electrical shock. She determined that he is a poor candidate for therapy because he is resistant to psychological explanations.
Dr. Phillip Griffin, another clinical psychologist determined that Moses Davis was clinically depressed, most likely as a result of his living with constant pain. Dr. Griffin stated that Moses Davis is attempting to cope with his pain, to remain active and to downplay his complaints.
Although Defendant contends that Moses Davis misrepresented his complaints to the physicians, they believed that he was truthful and not malingering. Furthermore, although Defendant claims that Moses Davis had pre-existing complaints of impotence as evidenced by two letters to Dr. Marra from Drs. Jack Goodman and Ronald Ravin in 1990, he asserts that his pre-existing condition was a prostate problem. Nonetheless, Martha Davis testified that he had no problems with impotency before this incident, but that afterwards, their sex life got worse dramatically.
The evidence shows that some of Moses Davis' complaints may have pre-dated the incident. However, the evidence also shows, as found by the trial judge, that they were aggravated by the electrical shock. Although Defendant argues that he had rotator cuff surgery in 1997, which was unrelated to the accident, we find no evidence in the record, other than Defendant's argument or theoretical questions to the witnesses, that he had such a surgery. Nonetheless, the trial judge did not award Moses Davis damages for shoulder surgery. He found that he sustained an impingement to the shoulder, or bursitis, as testified to by Dr. Farris, and that he would continue to experience symptoms due to the impingement. In addition, Moses Davis suffered a traumatic shock to his body resulting in painful burns, painful and tedious treatment procedures, permanent, disfiguring scars, with their attendant sensitivity, and a predisposition to sun and chemical burns. Although he got better, the recovery from the burns was gradual over the course of one year. In addition, Moses Davis suffered an aggravation of some prior complaints and has residual emotional problems and shoulder pain related to the accident. The trial judge awarded Moses Davis $175,000 in general damages. After our review, we find no abuse of discretion in the award.

INTERVENTION AWARD
Defendant asserts that the trial judge erred in awarding the Intervener's claim against Defendant. It contends that the award should be deducted from the award to Moses Davis, otherwise, he receives double recovery. Furthermore, Defendant argues that the award violates La. R.S. 23:1103, which states:
A. (1) In the event that the employer or the employee or his dependent becomes party plaintiff in a suit against a third person, as provided in R.S. 23:1102, and damages are recovered, such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee...
B. The claim of the employer shall be satisfied in the manner described above from the first dollar of the judgment without regard to how the damages have been itemized or classified by the judge or jury. Such first dollar satisfaction shall be paid from the entire judgment, regardless of whether the judgment includes compensation for losses other than medical expenses and lost wages. (Emphasis added.)
*239 We agree with Defendant. An employer's claim must be satisfied from the judgment, as set forth in R.S. 23:1103(B). Thus, we amend the judgment to deduct the Intervener's claim from the award to Moses Davis.
Accordingly, the judgment of the trial court is hereby affirmed as to liability and damages. It is amended to award the Intervener the amount of $32,155.24, to be satisfied from Moses Davis' award. The judgment is otherwise affirmed.
Costs of appeal are to be paid by Defendant.
AFFIRMED IN PART, AMENDED IN PART AND AFFIRMED AS AMENDED.
NOTES
[1] Moses Davis divorced Martha Davis the following year and married someone else. At the time of trial, Moses Davis had left his second wife and was reunited with Martha Davis, although they had not remarried.
[2] Both the NESC and a handbook interpreting the NESC were introduced into evidence.