| ¡¡.CANNELLA, Judge.
Defendants, the Estate of Essie P. Breaux and First Financial Insurance Company (First Financial), appeal from a judgment in a case of the wrongful death of a child by fire, filed by Plaintiffs, Ronald LeBlanc, Sr. and Diane Copeland, individually and on behalf of their deceased minor child, Ronald LeBlanc, Jr. (Ronald). Plaintiffs answered the appeal and seek an increase in damages to Ronald LeBlanc, Sr. We affirm.
On January 9, 1993, a fire erupted in a home rented in December of 1992 by Defendant, Pamela Willett (Willett), from Defendant, Essie Breaux (Breaux). The previous tenant, Johnny Richoux (Richoux), left numerous items of mostly junk, both in and outside of the house. Among the stored items in the rear room of the house were two refrigerators, three Coleman lanterns, lantern fuel, cans of paint, old car batteries, tools, and old lumber. There was also a gas dryer and water heater in the room. The room had only one possible exit, a window at the back of the room, that was blocked by plywood boards. Thus, the sole exit from [3the room was through the door into the main house. The house did not have any fire extinguishers.
According to Willett, before Breaux agreed to rent, Breaux performed a “walk through” and told Richoux that he needed to remove the “junk” from the house and the yard. Willett understood that Breaux intended to withhold the deposit from Ri-choux until the premises was cleaned. However, Willett was anxious to move into the house, so Breaux agreed to let Willett and Richoux work it out. Willett testified that Breaux knew that Willett»had a minor son living with her and that she sometime babysat for other families. After moving in, Willett and her boyfriend, Walter Champagne (Champagne), began the *535 cleanup, starting with the yard, rather than the house. Before the job was finished, Richoux never returned. By the time of trial, Breaux had died and no other witness contradicted Willett’s version of the events leading to the fire.[1]
On the day of the fire, Willett was babysitting Ronald, age 18 months, and another child, Skylar, age two or three. She often babysat for Ronald, who was running around the house, playing with Skylar and Willett’s son, Michael, age 12, and his friend, Kale Austin (Kale), age 14. Because Willett was concerned that the shelves holding the Coleman lanterns in the back room were unstable and might fall, she instructed Michael to remove the lanterns after draining them of any fluid. Michael was not familiar with this type of lantern. In order to determine if there was any fluid in one of them, he attempted to light a match. Ronald was in the room with the boys at the time. Flames erupted, catching other items in the room on fire and creating a fire barrier across the room between the |4back wall and the entry door. The flames imprisoned Kale and Ronald on the side of the room with no exit. Kale managed to escape by pulling off some wall boards and making a hole. He reached in several times to try to get Ronald out, but was unsuccessful because of the smoke and flames. In the meantime, Willett, who was on the other side of the flames when the fire started, also tried unsuccessfully to get to the two children. Then, because she had no phone, she ran out of the house screaming for help. The fire department arrived. Heavy smoke engulfed the house. Chief Rickie Eslick went to the back of the house to make sure that there was an exit for the firemen. He pulled a vent and some boards off of the exterior wall. When the boards were removed, he discovered the child who was either unconscious or dead, with severe external burns. Ronald was officially pronounced dead at the hospital, after unsuccessful attempts to revive him by the firemen at the scene and other emergency personnel. His death certificate states the cause of death as asphyxiation or smoke inhalation.
Plaintiffs filed suit on November 15, 1993 for the wrongful death of Ronald and for the child’s damages against Wil-lett, Champagne, Breaux, First Financial, Breaux’s insurer, and Lavertis Austin, the father of Kale. Defendants, Breaux and First Financial filed an exception of no right or cause of action, a reconven-tional demand against Diane Copeland, and a third party action against the other Defendants on January 4, 1994. On July 13, 1994, Breaux and First Financial filed for a summary judgment, supported by Willett’s deposition, portions of Kale’s deposition and an affidavit by Breaux. The motion was denied in March of 1995. Supervisory writs were denied on April 7, 1995.
On March 20,1996, Diane Copeland filed an exception of no cause of action to Breaux’s reconventional demand.
IsOn June 3, 1997, Plaintiffs obtained preliminary defaults against Defendants, Champagne, Willett, and Austin, who were unrepresented by counsel.
The matter was tried before a jury on July 12th and 13th, 1999. Champagne and Austin did not appear at trial. Willett represented herself. After the trial, the jury returned a verdict in favor of Plaintiffs, finding Willett 90% at fault and Breaux 10% at fault in the accident. The jury awarded Ronald $100,000 for his pain and suffering. It further awarded each Plaintiff $50,000. In the judgment dated August 10, 1999, the trial judge added stipulated medical and funeral expenses to the award.
Plaintiffs subsequently filed a Motion for Judgment Notwithstanding the Verdict (JNOV)j asking for their awards to be increased. The trial judge granted the *536 JNOV as to Diane Copeland, increasing her award to $150,000, and denied the JNOV as to Ronald LeBlanc, Sr.
On appeal, Defendants assert that the trial judge erred in finding Breaux at fault, in refusing to admit into evidence Breaux’s affidavit, and in granting the JNOV which increased the damage award to Diane Copeland.
Plaintiffs answered the appeal, asking for an increase in the damages awarded to Ronald LeBlanc, Sr.
Defendants first contend that the jury erred in finding Breaux at fault. They argue that the record contains no evidentiary support for this finding under either negligence or strict liability.
On appellate review, the court’s function is to determine whether the jury’s findings were clearly wrong or manifestly erroneous. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of lfifact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Brown v. Seimers, 98-694 (La.App. 5th Cir.1/13/99), 726 So.2d 1018, 1021, writ denied, 99-0430 (La.4/1/99), 742 So.2d 556; Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether its conclusion was a reasonable one. Brown, 726 So.2d at 1021; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Brown, 726 So.2d at 1021; Stobart, 617 So.2d at 882. Only where the documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness’s story, may the court of appeal may find manifest error, even in a finding purportedly based upon a credibility determination. Brown, 726 So.2d at 1021; Rosell 549 So.2d at 844-45.
The fire occurred in 1993, prior to the 1996 amendment to La. C.C. art. 2322 and the enactment of Article 2317.1. Thus, we will apply the law in effect prior to the amendment and enactment.
In Celestine v. Union Oil Co. of California, 94-1868 (4/10/95), 652 So.2d 1299, 1303-1304 (La.1995), the Louisiana. Supreme Court stated:
An owner’s liability for a vice or defect on the premises is rooted in La. C.C. arts. 2317 and 2322.(FN2) Both articles impose strict liability, or liability without fault, based upon status as an owner or custodian rather than on personal fault.... Under La. C.C. art. 2317, liability is imposed upon an individual as a custodian for damage caused by things in his custody.... Under La. C.C. art. 2322, an owner is liable for damages to any person injured in an |7accident caused by the owner’s neglect to repair the building or from a defect in its original construction....
To recover under La. C.C. 2317, a Plaintiff must prove that he was injured by a thing which was in the care or custody of the Defendant and that such thing was defective.... To recover under La. 2322 against an owner of a building, a Plaintiff must prove that the building posed an unreasonable risk of injury to others and that he was damaged by virtue of this risk....
A building owner is not responsible for all injuries resulting from any risk posed by his building; he is only liable for those injuries caused by an unreasonable risk of harm to others.... Likewise, strict liability requires the Plaintiff to prove that the vice or defect of the thing is a condition which poses an unreasonable risk of harm to others.... Thus, to prevail under the strict liability theories embodied in La. C.C. arts. 2317 *537 and 2322 ... must show that he was exposed to an unreasonable risk of harm....
We addressed the methodology for determination of whether a risk was unreasonable in Entrevia v. Hood, [427 So.2d 1146 (La.1983)] supra, where a trespasser sued the owner of an unoccupied farmhouse for damages sustained allegedly caused by a defect in the rear steps, alleging strict liability. We concluded that under the circumstances, “in light of all relevant moral, economic and social considerations, the defective steps did not pose an unreasonable risk of harm to others.” 427 So.2d at 1147. In reaching this conclusion, we cautioned that the unreasonable risk of harm criterion was not a simple rule of law which could be applied mechanically to the facts of a case. Justice and social utility must serve as guideposts and moral, social and economic values must be considered in a determination of whether the risk is unreasonable. Claims and interests should be balanced, risk and gravity of harm should be weighed, and individual and societal rights and obligations must be considered. Entrevia, 427 So.2d at 1149 .... [Citations omitted]
La. C.C. art. 2315 provides that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. La. C.C. art. 2316 states that every person is responsible for the damage he occasions, not merely by his act, but by his negligence, his imprudence or his want of skill. Plaintiffs bear the burden of proving every element of their case by a preponderance of the evidence, that is, whether it is more likely than not, that the harm was caused by the tortious conduct of the defendants. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). In determining whether the defendant’s conduct is negligent, the courts apply the duty/risk analysis. Todd v. State Through Dept. of Social Services, Office of Community Services, 96-535 (La.App. 5th Cir.11/26/96), 685 So.2d 313, 317; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). This requires the following findings:
1. That the conduct was a cause in fact of the resultant harm;
2. That a Defendant owed Plaintiff a duty;
3. That the duty owed was breached by a Defendant;
4. That the risk of harm was within the scope of the breached duty.
Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991).
Whether a defendant owes a plaintiff a legal duty is a question of law. Todd, 685 So.2d at 317. In Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229, 233, the Louisiana Supreme Court stated:
“In determining whether to impose a duty in a particular situation, the court may consider various moral, social, and economic factors, including whether the imposition of a duty would result in an unmanageable flow of litigation; the ease of association between the Plaintiffs harm and the Defendant’s conduct; the economic impact on society as well as the economic impact on similarly situated parties; the nature of the Defendant’s activity; moral considerations, particularly victim fault; and precedent as well as the direction in which society and its institutions are evolving.”
Once the court finds that a duty exists, the trier of fact must decide if the defendant breached the duty. Id. at 233-4. This is a question of fact. Todd, 685 So.2d at 317.
Finally, the plaintiff has the burden of proving that the thing poses an unreasonable risk of harm. Davis v. Louisiana Power & Light Company, 00-13, 00-14 (La.App. 5th Cir.5/17/00), 762 So.2d 229, 233 (La.App. 5th Cir.5/17/00). In determining whether a particular risk is un *538 reasonable, the beneñt of the thing must be balanced with its potential for harm and the cost of prevention. Socorro, 579 So.2d at 939.
Thomas Lowe, the investigator for the Jefferson Parish Fire Department, testified that the back room did not and should have had a secondary means of exit for safety. In addition, the room was a fire hazard because of the number and types of items stored there. However, he stated that Breaux was not cited for violation of any fire regulation.
According to expert Mark Jee, Chief of the Fire Prevention Division in the New Orleans Fire Department, the fire would have burned itself out had it not been for combustibles that helped spread the fire quickly and which were stored in the area of the initial ignition. Chief Jee stated that the excessive accumulation of combustibles in one area represents too great a fuel load. That accumulation plus the lantern fuel caused the heavy smoke.
Both of the conditions in the house caused the death of Ronald LeBlanc, Jr. These conditions constituted vices or defects. The combustibles caused the room to become engulfed in flames, while the boarded window trapped the children when the room caught fire. Both were substantial factors in bringing about the harm and both conditions created an unreasonable risk of harm. Furthermore, Breaux knew or should have known that the back room was unsafe. Between the time that Willett moved into the house and Richoux left, the house was in Breaux’s custody. Further, the uncontradicted evidence shows that she walked through the house before returning the deposit to Ri-choux. According to the testimony, Breaux was aware of the “junk”, stored in and around the house. 1 inNevertheless, regardless of what she “knew” about the junk in the back room, she certainly knew that the back window, the only secondary exit was boarded, creating a fire trap. As owner of the property, Breaux had control at least over the window problem, which she failed to repair. Breaux is not relieved of liability by either not being cited by the fire department, or because Willett is also liable. The jury in this case determined that Breaux was liable. Based on the evidence, we conclude that the jury finding was not manifestly erroneous and the judgment will be affirmed as to liability.
Defendants next assert that the trial judge erred in excluding from evidence an affidavit made by Breaux and submitted with her Motion for Summary Judgment that was denied. Defendants contend that since an affidavit is accepted for purposes of the summary judgment motion, it is an exception to the hearsay rule because it is a substitute for testimony.
La. C.E. art. 802 states that hearsay is not admissible, except as otherwise provided by the Code of Evidence or other legislation. Art. 804 provides exceptions when the declarant is unavailable. The statute states in part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant ...
(4) Is unable to be present or to testify at the hearing because of death....
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness ...
(6) Other exceptions. In a civil case, a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy, and the proponent of the evidence has adduced or made a reasonable effort to adduce all other Inadmissible evidence to establish the fact to which the proffered statement relates and the propo *539 nent of the statement makes known in writing to the adverse party and to the court his intention to offer the statement and the particulars of it.... ■
Plaintiffs filed a Motion in Limine to exclude the affidavit. The trial judge granted the motion. Defendants claim that they were prejudiced by the exclusion because the affidavit would have shown that Breaux did not know about the combustibles in the back room. Plaintiffs respond that the statement is inherently untrustworthy and the circumstances here were not so extraordinary or compelling that the trial court should have allowed the statement into evidence. Plaintiffs point out that the affidavit was executed long after suit was filed and that this self-serving, artfully worded statement was made under legal supervision, with the specific purpose of defeating the principal theories of liability by summary judgment. Plaintiffs further argue that Defendants knew that Breaux was in ill health in November of 1997, three years after Breaux executed the affidavit, and elected not to perpetuate her testimony.
The affidavit, in this case, lacks the trustworthiness to fall within the hearsay exception. It was executed specifically to defeat liability. Furthermore, it fails the “extraordinary circumstances” test. See: La. C.E. B(6) comments. Breaux’s deposition was never taken in this case. Her affidavit was executed in October of 1994 in conjunction with her Motion for Summary Judgment. The motion was denied by the trial judge in March of 1996. In April of 1996, this court denied writs because the affidavit and Willett’s deposition testimony raised Breaux’s knowledge as a issue of fact. In November of 1997, Defendants filed a motion to continue the trial based on the allegation that Breaux was suffering “acute symptoms from colon and lung cancer.” Breaux was obviously seriously [ 1giH. The motion was denied and Defendants applied for supervisory writs to this court. We granted the writ and ordered the continuance. However, the trial judge was also ordered to admonish the Defendants “regarding the taking of her deposition for the perpetuation of testimony to avoid future requests for continuances.” Knowing how ill she was, Defendants should have perpetuated Breaux’s testimony. Based on these facts, we find that the trial judge did not err in granting the Motion in Limine and in excluding Breaux’s affidavit.
Defendants next argue that the trial judge erred in granting the JNOV and in increasing the damages to Dixie Copeland.
In Plaintiffs’ appeal, they contend that the trial judge should have granted the JNOV and raised Ronald LeBlanc, Sr.’s damages.
In Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991), the Court stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied ... In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. (Citations omitted)
See also: Durham v. Stevens Transport, Inc., 98-1261 (La.App. 5th Cir.3/30/99), 731 So.2d 451, 454; Mendoza v. Mashburn, 99-499 (La.App. 5th Cir.11/10/99), 747 *540 So.2d 1159, 1163, writ denied, 2000-0037(La.2/18/00), 754 So.2d 976.
|13The evidence shows that Diane Copeland enjoyed a close and loving relationship with her son. He was provided all the necessities of life and was a healthy, happy toddler who was the focus of Dixie Copeland’s life. She said that although she and Ronald LeBlanc, Sr. were young and did not have a nice home and car, they took care of Ronald, who was a beautiful child. She said that they loved the child very much. Diane Copeland stated that when she and Ronald LeBlanc, Sr. learned of Ronald’s death, they were devastated. At the wake, they sat by the casket the entire time. Diane Copeland testified that it was hard to cope without Ronald after his death. The worst part was not seeing him anymore. She testified that she took Ronald everywhere and only left him with others when she was working. Diane Copeland explained that when she was growing up her parents were good, but not affectionate. Ronald, on the other hand, loved her without reservation or judgment. Diane Copeland was also upset because people could hear Ronald crying in the fire. She testified that it was painful to know that while he was conscious, Ronald wondered where his mother and father were and she wasn’t there to help him. She said that the knowledge that Ronald had to suffer, even for twenty seconds, hurt her the most. Diane Copeland visits Ronald’s grave on his birthday, Christmas and the anniversary of his death.
Ronald LeBlanc, Sr. has three children. Defendants claim that he has abandoned two of them, yet expects this court to increase his award. Plaintiffs claim that he loved Ronald, and the loss of Ronald has changed him and caused him to have difficulty holding down a job.
Six months after Ronald was born, Ronald LeBlanc, Sr. said that he quit his job to care for Ronald so that Diane Copeland could return to work. Diane Copeland testified that she went back to work within eight weeks and that Ronald |14LeBlanc, Sr. took care of Ronald most of the time. When Ronald LeBlanc, Sr. began to do odd jobs for others, the couple started using Willett as a babysitter. Nonetheless, Ronald LeBlanc, Sr. fed, bathe and played with Ronald and taught him to walk. Diane Copeland said that Ronald LeBlanc, Sr. was devastated by the death and attempted suicide at least once by taking an overdose of Xanax. He does not visit Ronald’s grave because he feels that he would not be able to leave. He thinks about Ronald every day. Diane Copeland testified that he probably has not fully dealt with Ronald's death.
Ronald LeBlanc, Sr. has a nine or ten-year old daughter in Georgia that he neither visits nor supports because, according to him, the mother asked him not to have anything to do with the child. He has not seen the child since she was three or four years old. He also has another son with Diane Copeland that.was conceived and born after the death of Ronald. He has essentially abandoned that child because, after Ronald’s death, he is afraid to be in his life. Ronald LeBlanc, Sr. testified that he cannot go through that again.
Based on the evidence, we find that the facts and inferences point so strongly and overwhelmingly in favor of raising Diane Copeland’s damages that reasonable men could not have arrived at a contrary verdict. We further find that the evidence is not so overwhelming in favor of raising Ronald LeBlanc, Sr.’s damages. Therefore, we affirm the damages in his case.
Finally, our review of the record discloses several unresolved exceptions and claims which are not addressed by the parties. The record contains two exceptions of no cause of action, one by Breaux to the Plaintiffs’ petition and one by Diane Copeland to a reconventional demand filed by Breaux. Also, Breaux filed third-party claims against Willett, Champagne and Austin that are not 11fimentioned in the judgment. However, the trial judge granted directed verdicts in favor of *541 Champagne and Austin during the trial, so we can presume from silence of the judgment that the reconventional demand and the third-party claims were denied. We find no error in denial of these claims. Furthermore, since the parties failed to urge that the peremptory exceptions of no cause of action be heard or judgment rendered and have not argued the exceptions on appeal, we conclude that the parties have waived or abandoned the exceptions. See: The Research Group, Inc. v. Sharp, 430 So.2d 165, 169 (La.App. 2nd Cir.1983).
Accordingly, the trial court judgment is hereby affirmed. Costs of this appeal are to be divided among the parties.
AFFIRMED.

. Breaux died on December 1, 1997. Her estate, through her succession representative, Thomas Breaux, was substituted in April of 1998.