841 So.2d 51 (2003)
Perry BURNS
v.
UHS OF NEW ORLEANS, INC., Individually, d/b/a, and Chalmette Medical Center, and Chalmette Medical Center, Inc., UHS of De La Rhonde, Inc., Individually, d/b/a, and Chalmette Medical Center.
No. 2002-CA-1514.
Court of Appeal of Louisiana, Fourth Circuit.
February 19, 2003.
Writ Denied May 9, 2003.
*52 Robert F. Shearman, Kevin D. Shearman, Shearman & Shearman, L.L.C., New Orleans, LA, for Plaintiff/Appellee.
David A. Bowling, Douglas R. Kraus, Wilson & Bowling, New Orleans, LA, for Defendant/Appellant.
(Court Composed of Chief Judge WILLIAM H. BYRNES III, Judge MAX N. TOBIAS, JR., Judge DAVID S. GORBATY).
MAX N. TOBIAS, JR., Judge.
In this medical malpractice case, the defendant, Chalmette Medical Center, Inc. ("CMC")[1], appeals the judgment against it, contending that it should be reversed, or in the alternative, that the award of damages should be reduced. In addition, the plaintiff, Perry Burns, asks the court to set aside or, in the alternative, reduce the allocation of comparative fault of 30% against him. For the reasons set forth below, we reverse the judgment and render judgment in favor of the defendant.
The plaintiff alleged medical malpractice against CMC after he underwent surgery for the removal of a boil from his buttock. Prior to the procedure, a saline or "Jelco" lock was placed in Mr. Burns' left arm.[2] *53 CMC concedes that the Jelco lock was not removed before Mr. Burns was discharged from the hospital. The plaintiff alleges that his mother discovered the Jelco lock, which the plaintiff describes as a needle, protruding from his arm surrounded by dried blood; she removed the Jelco lock herself without difficulty. Mr. Burns subsequently sought medical treatment for pain, weakness, and numbness in the arm, as well as a substantial loss of use of the arm.
The matter was presented to a Medical Review Panel, which determined that CMC failed to comply with the appropriate standard of care as alleged in the petition. With regard to the issue of causation, the ruling stated: "One panelist is of the opinion that the patient suffered damage; two panelists are of the opinion that the patient did not suffer damage."
At the commencement of the 9 October 2001 bench trial, the parties stipulated on the record that CMC breached the applicable standard of care by failing to remove the Jelco lock prior to the plaintiff's discharge from the hospital. However, a determination as to the existence or cause of any injury or contributory or comparative fault was left to the determination of the trial court.
The trial court issued its judgment on 11 October 2001, wherein it entered judgment in favor of the plaintiff and against CMC in the amount of $35,000.00. The court further assessed the plaintiff with comparative fault in the amount of 30%. In the reasons for judgment issued the same day, the court stated:
The testimony of Dr. Salvador E. Murra, the treating physician and Dr. Austin Sumner, a plaintiff expert were persuasive and when combined with the testimony of Dr. Dileo, the long time treating physician which the court felt corroborated the plaintiff that there was no prior injury, and particularly notify [sic] that there were objective findings by Dr. Murra. The court found for the Plaintiff.
The court however did find that a reasonable, prudent man would have returned to the hospital or sought other professional medical help once he realized that an instrument remained in his arm, and therefore finds comparative fault.
On 16 November 2001, the trial court issued an amended final judgment upon motion for clarification and/or for new trial filed by CMC. In that judgment, the trial court reduced the award of damages by 30%, or from $35,000.00 to $24,500.00, plus court costs and legal interest. Both parties seek review of the judgment.
Before addressing the issues presented on appeal, we set forth the facts as detailed in the evidence introduced during trial. The medical records reveal that Mr. Burns was admitted to the emergency room at CMC on 19 June 1997 at 9:10 a.m., complaining of a boil on his right buttock. At 10:30 a.m., Mr. Burns was given saline though a saline or "Jelco" lock, which had been placed in his left forearm.[3] At 10:58 a.m., 2 milligrams of Versed were administered intravenously. Soon thereafter, Dr. Domangue incised the boil, and a few minutes later, the plaintiff was reported to be *54 sleeping comfortably. At 11:25 a.m., the wound was cleaned with saline and dressed. When the plaintiff complained of pain at 11:45 a.m., he was given 12.5 milligrams of Demerol intravenously, which relieved the pain.[4] When the plaintiff was discharged at 11:50 a.m., the wound was warm and dry. Plans were made for Mr. Burns to return the next day for a followup appointment.[5] He was instructed as to how to take his medication and told to take salt baths. The plaintiff was also told, and given written discharge instructions, to return to the ER if any problems occurred. Mr. Burns stated that he understood those instructions. The plaintiff's uncle, William Dison, took Mr. Burns to his mother's house.
The plaintiff's chart reflects that at 12:40 p.m., the plaintiff's mother, Rosemary Thompson, called the hospital and spoke with Nurse Todd Cooper, stating that the Jelco lock was still in place. Nurse Cooper advised Ms. Thompson to bring Mr. Burns back to the hospital so it could be removed; Ms. Thompson abruptly hung up the phone. At 12:45 p.m., Nurse Peggy Hartdegen, the charge nurse, was informed of the situation. Nurse Cooper called Ms. Thompson at 12:50 p.m., but there was no answer. He tried several times to call, but could not reach Ms. Thompson. Finally, at 7:00 p.m., Nurse Cooper spoke to Ms. Thompson, who reported that she had removed the Jelco lock herself without problems. She told Nurse Cooper that she had done so because the plaintiff could not find a ride to the hospital.[6]
Contrariwise, Ms. Thompson testified that when she saw her son after the surgery, his arm was bleeding profusely. Upon examination, she saw that a "needle" had been left in his left arm at the crease of the elbow. She called the hospital to speak with the doctor who treated her son, but was told that the doctor was busy and that he would call her back. About onehalf hour later, the hospital called and told her to bring Mr. Burns back, but she had already pulled out the "needle." She did so because she was afraid that he was "bleeding to death." She testified that she removed a long metal needle from his arm.
On 30 June 1997, Mr. Burns saw Dr. F.J. Soler, complaining of pain and swelling in the antecubital area of his left arm. This was the area where the plaintiff claims the Jelco lock had been placed. The plaintiff was found to have a small area of swelling and mild tenderness in the antecubital fossa; Dr. Soler diagnosed localized thrombophlebitis and Mr. Burns was instructed to apply warm compresses to the affected area. Although he had improved by his 8 July 1997 visit, Mr. Burns returned to Dr. Soler on 21 August 1997, complaining that he could not hold things with his left arm. Dr. Soler referred the plaintiff to Dr. Salvador E. Murra, a neurologist.
Mr. Burns saw Dr. Murra on 22 August 1997, complaining of burning, pain, numbness, and weakness of the hands. Sensory studies of 10 September 1997 revealed probable polyneuropathy, an acute neuropathy at or below the left elbow and bilateral carpal tunnel syndrome.
*55 Mr. Burns' treating physician, Dr. Lucas DiLeo, a general practitioner, testified at trial. Dr. DiLeo stated he first saw Mr. Burns in April 1994, when he presented with complaints of back pain. A history showed that the plaintiff had a rod inserted in his back due to scoliosis approximately 15 years earlier. He was diagnosed with recurrent low back myofascial pain syndrome secondary to scoliosis. He was put on various medications for his symptoms. Mr. Burns saw Dr. DiLeo on numerous other occasions for updated evaluations and prescriptions of medications. His diagnosis remained unchanged for his back symptoms.
With the exception of some minor ailments, the plaintiff's symptoms and diagnosis were unchanged from 1994, until his last visit in May 1999. His medical records indicate that the plaintiff never made a single complaint regarding his left arm to Dr. DiLeo in any of the sixteen visits made after the alleged injury at issue in this matter. In fact, Dr. DiLeo saw Mr. Burns on 1 July 1997, less than two weeks after the incident at issue. At that time, the plaintiff made no complaints regarding his left arm and the physical exam revealed nothing irregular with the arm. Dr. DiLeo discharged the plaintiff from further care on 25 May 1999, after he learned that Mr. Burns was receiving narcotic pain medication from another doctor and did not advise Dr. DiLeo of that fact.
In December 1999, the plaintiff twice returned to CMC with a chief complaint of a left ankle injury. He told the emergency room personnel that he sustained a left ankle/foot injury while playing basketball. He specifically told Nurse Cooper (the same nurse who inserted the Jelco lock at issue in this case) that he twisted his left ankle while "jumping going for a rebound." No mention was made by Mr. Burns of any injury to his left arm.
The plaintiff testified at trial that Nurse Cooper inserted the Jelco lock at the crease of his elbow on his left arm. He claimed that the symptoms of loss of use of his left hand appeared a week or two after the surgery to his buttock. Mr. Burns stated that he could not do many things with his hand, such as lift his arm, pick up his daughter, hold things, write, play basketball, and wash cars. Upon further examination, he clarified that he could accomplish these activities "every now and then."
During cross-examination, Mr. Burns admitted that his mother removed the Jelco lock after being told to return to the hospital for its removal. He also stated that the last time he saw a doctor for his arm was in September 1997. He confirmed that when his deposition was taken in December 1998, he could not hold things for long, tightly squeeze the nozzle of a hose for a period of time, play basketball, or wash cars.
One month after the plaintiff's deposition, CMC retained the services of Frank Vitrano, a private investigator, to conduct surveillance on Mr. Burns on 16 January 1999. A videotape of the surveillance was admitted into evidence. Mr. Vitrano testified that he observed Mr. Burns engaged in cleaning and washing vehicles using both of his hands, and possibly performing mechanical repairs on a vehicle. According to Mr. Vitrano's observations, Mr. Burns did not appear to be limited in the movement of his left arm during the time he was under surveillance or exhibit any signs of pain or discomfort. Our review of the videotape confirms Mr. Vitrano's observations, as discussed infra.
The plaintiff presented the testimony of his treating physician, Dr. Murra, a board certified neurologist, who stated that Mr. Burns had sustained damage to the high median nerve of the left arm, although he *56 also demonstrated irregularities on the right side, an extremity not affected by the Jelco lock placement. The diagnosis was confirmed through a nerve conduction study. Dr. Murra testified that it was an unusual injury, but that the study showed that an injury occurred at the elbow. He sees a high medial neuropathy only once or twice a year; more often he sees injury lower on the arm, at the carpal tunnel. Dr. Murra causally related Mr. Burns' injuries to the incident at the hospital.
Under cross-examination, however, Dr. Murra conceded that he did not know exactly what caused the injury to the plaintiff's arm. He knew that something happened high in the area of the arm, but that it could have been some kind of reaction since the plaintiff had presented to Dr. Soler with a thrombophlebitis, which could cause swelling or redness. He, however, was relying on the history given by the plaintiff in making his findings.
Finally, Mr. Burns presented the expert testimony of Dr. Austin John Sumner, a board certified neurologist, who served on the medical review panel regarding the plaintiff's claim against CMC. Dr. Sumner was the expert who opined that the "Jelco and its placement may have caused the patient's complaints at the elbow based on the neurological exam and the EMG studies." Dr. Sumner stated that it is "relatively common" to injure the median nerve at the elbow when an IV line is placed there because the nerve lies just medial to the tendon biceps. The veins that one attempts to impale while performing an IV infusion overlay the nerve. In doing so, the nerve can be impaired in various ways. However, Dr. Sumner testified that he would expect the abnormalities of nerve function to be evident virtually instantaneously, not when Mr. Burns' mother removed the Jelco lock. He reviewed Mr. Burns' record and satisfied himself that Mr. Burns was not sedated at the time the needle was inserted, and admitted that had the injury occurred as plaintiff alleged, Mr. Burns would have felt an immediate painful electric-shock-like sensation in his arm.
Dr. Sumner identified two mechanisms of injury to the high median nerve through the use of a Jelco lock: (1) at the time the Jelco is inserted in the antecubital fossa and (2) the physical presence of an object in the facility of the nerve for two or three hours. Dr. Sumner, however, admitted that he could not remember ever having started an IV, and testified that he had never seen Mr. Burns. Dr. Sumner testified only that the catheter placement might have caused Mr. Burns' alleged injuries if it had been placed in the antecubital fossa.
Dr. Sumner was also questioned about the placement of the needle. He told the court that the antecubital fossa is the term given to a particular portion of the forearm. Therefore, the documentation of a needle placed in the forearm did not preclude it being placed in the antecubital fossa. One term is more specific descriptively than the other.
CMC presented the expert testimony of the two doctors who sat on the medical review panel with Dr. Sumner, Dr. Brobson Lutz, board certified in internal medicine, and Dr. Thomas A. Krefft, a board certified neurologist, who testified by deposition. Dr. Lutz testified that he had administered, examined, treated, or placed over 1,000 Jelco locks during his twentythree years of private practice. During that time, Dr. Lutz had never encountered a patient with a medial nerve injury from a Jelco lock. He also researched the medical literature related to this matter and could not find any published reference to any similar type of injury caused by the instrument. Dr. Lutz testified that had Mr. Burns sustained an injury to the median *57 nerve, he would have experienced symptoms immediately. Dr. Lutz reaffirmed his opinion that the breach in the standard of care in discharging the plaintiff with the one-inch pliable plastic catheter still in place caused no injury to the plaintiff, which opinion he arrived at after reviewing Mr. Burns' medical records from CMC, Dr. Murra, and Dr. Soler.
Dr. Krefft testified that he had seen patients with median nerve neuropathy on over 1,000 occasions. Based on his review of the medical records, as well as his expertise and years of experience, Dr. Krefft testified that the plaintiff did not sustain any injury from the Jelco lock. He stated that the only possible injury to the nerve would have been at the time the needle was inserted and, in such a case, the plaintiff would have experienced immediate pain. Dr. Krefft also testified that he did not see any possible way that the pliable Jelco catheter itself could have damaged something as tough as the median nerve. In addition, Dr. Krefft stated that in his seventeen years of private practice, he had never heard of any injury caused by withdrawing a Jelco. Again, if an injury occurred during removal, Dr. Krefft testified that Mr. Burns would have immediately displayed symptoms of injury. Finally, Dr. Krefft could not establish causation between Dr. Soler's findings of 30 June 1997 and the results of the studies performed by Dr. Murra.
CMC presented abundant evidence to distinguish between the forearm and the antecubital fossa. First, Nurse Cooper testified that he specifically inserted the Jelco lock in the forearm, as reflected in his contemporaneous chart notation. Nurse Cooper had used the Jelco lock 4,000 to 5,000 times during his years working as a paramedic and nurse. He stated that on the rare occasions that he inserts a Jelco at the antecubital fossa, he notes "AC" in the chart, not "forearm," as he did in the instant case. In his charting practice, the forearm and the antecubital fossa are two different regions altogether. Finally, he testified that he does not like to start a Jelco in the antecubital fossa because it gives the patient discomfort, can dislodge with movement, and infiltrate under the skin.
The charge nurse on duty at the time of the incident, Peggy Hartdegen, also testified that the practice at CMC is to chart the location at which a Jelco is started. If it is placed in the antecubital fossa, they chart "AC." If it is in the hand or wrist, they specify the location. Usually, a Jelco is started in the forearm, which she described as two inches above the wrist to about two inches below the elbow. Like Nurse Cooper, Nurse Hartdegen testified that she prefers to insert a Jelco in the forearm rather than in the antecubital fossa for many reasons.
The distinction between the antecubital fossa and the forearm was corroborated by both Drs. Lutz and Krefft. Even Dr. Sumner testified that the antecubital fossa is a triangular location that extends from the crease of the elbow, although he stated that the antecubital fossa is technically a portion of the forearm itself.
The burden of proof in a malpractice suit is governed La. R.S. 9:2794(A). A medical malpractice claimant carries a burden of proof that is two-fold. The plaintiff must establish by a preponderance of the evidence that the treatment was below the standard of care for particular specialties and a causal relationship existed between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276 (La.1991); Moore v. Wal-Mart, Inc., 98-1806 (La.App. 4 Cir. 3/10/99), 729 So.2d 187, writ denied, 99-0984 (La.5/28/99), 743 So.2d 669. In the *58 instant matter, the parties stipulated to the fact that CMC breached the standard of care. The plaintiff, however, was still required to prove by a preponderance of the evidence that CMC's breach caused the high median nerve neuropathy documented in his medical records.
The "manifest errorclearly wrong" standard of review applies in this case, which has been explained as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.... Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong."
Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989) (citations omitted; emphasis added).
While a trial court's findings of fact may not be reversed absent manifest error or unless clearly wrong, this court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the trial court's decision was clearly wrong based on the evidence, or clearly without evidentiary support. Id. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State of Louisiana, through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880, 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La. 1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
*59 However, as cautioned by the Supreme Court:
Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever be upset.
Ambrose, 93-3099, 93-3110, 93-3112 at p. 8, 639 So.2d at 221 (emphasis added).
The only evidence in the record which supports the trial court's judgment is the testimony of Mr. Burns and his mother, who testified to the location of the Jelco lock at the antecubital fossa, Dr. Murra's testimony that there is a causal relationship between the placement of a Jelco lock at the antecubital fossa and the nerve conduction study results, and Dr. Sumner's testimony that such an injury was possible.[7] This is the evidence on which the trial court relied, as well as the fact that the plaintiff never complained of a prior injury to his left arm to Dr. DiLeo before the incident in question.[8]
All of the remainder of the evidence, however, favors the defendant. Nurse Cooper, the person who inserted the Jelco lock, testified that it was placed in the plaintiff's forearm and not the antecubital fossa. The medical records support this testimony. Both Drs. Lutz and Krefft testified that they had never known of an injury caused by a Jelco lock, whether while being inserted or removed. Further, all the medical testimony was to the effect that symptoms from a nerve injury would have manifested almost immediately, not a week or two later. In addition, the plaintiff saw Dr. DiLeo about two weeks after this incident and never mentioned an injury to his left arm during this visit or at any of fifteen appointments that followed. The court also takes note of the fact that while Ms. Thompson could not find a ride to take Mr. Burns to the hospital to remove the Jelco lock, she was able to take him there later that day to retrieve his car; curiously, Mr. Burns and Ms. Thompson did not seek medical attention despite their assertions that Mr. Burns was bleeding profusely before the lock was removed. Also, no indication exists that Mr. Burns kept his follow-up appointment the next day.
Finally, this court has carefully reviewed the surveillance tapes, which shows the plaintiff predominately using his left arm and hand to wash a car and pickup truck for over forty-five minutes, work on his car engine and jump out of the flat bed portion of a vehicle he was washing while pivoting on his allegedly impaired left hand. Despite his deposition testimony only one month earlier that he was severely restricted in his movements, Mr. Burns exhibited no restraint whatsoever in the use of his left arm and hand and showed no pain while performing these activities.
It is our considered opinion, after a careful, thorough, and thoughtful review of the testimony and objective evidence adduced in this case, that if the constitutional mandate of Article V, § 10, of the Louisiana Constitution, that this court review both fact and law is to have any meaning at all, the trial court's judgment must be reversed and judgment rendered in favor of *60 the defendant. The record in its entirety convinces the court that this is one of the rare cases in which the fact finder's judgment is manifestly erroneous and contrary not only to the weight of the evidence, but also contrary to the objective evidence. Although two doctors were willing to testify to a causal relationship between the incident and the plaintiff's injury, their testimony hinges on the Jelco lock having been placed in the antecubital fossa, or the crease of the elbow, and not the forearm, or the area two to three inches below the crease. The only testimony to support the placement of the Jelco lock at the antecubital fossa is that of the plaintiff and his mother, whose testimony is called into serious question by their actions after the incident and the surveillance videotapes.
Consequently, we reverse the trial court and enter judgment in favor of the defendant. All costs of this appeal are assessed against the plaintiff.
REVERSED AND RENDERED.
NOTES
[1] The petition named UHS of New Orleans, Inc., individually, d/b/a/, and Chalmette Medical Center, as defendants. UHS of New Orleans, Inc. was dismissed without prejudice by the trial court in the amended final judgment of 16 November 2001.
[2] The parties dispute the exact location of the Jelco lock, which is a material issue in this case.
[3] The Jelco lock itself is a small pliable plastic catheter. It is inserted into the vein by the use of a metal needle, which needle is then withdrawn and discarded. All that remains in the arm is about one-inch of the plastic catheter, through which medication and other fluids are administered. Nothing can flow through the Jelco lock if the metal needle is not removed. A Jelco lock can remain in the vein for up to 72 hours, per CMC regulations.
[4] The trial testimony was that 12.5 milligrams of Demerol is one-half of the dose usually given for pain.
[5] The record does not reflect whether Mr. Burns returned for his follow-up appointment.
[6] Ms. Thompson drove the plaintiff to the hospital later that evening to retrieve his car, but they did not seek treatment or have medical personnel examine his arm.
[7] Upon cross-examination, Dr. Murra was asked if the Jelco lock could have caused his findings of an injury if the lock was not started at the antecubital fossa. His reply was:

It might. It might cause damage to that; I don't know....Something caused it. I am not someone to say what caused that... It could be the needle, perhaps; I don't know.
[8] We also note that Mr. Burns never complained to Dr. DiLeo of an injury to the left arm after the incident in question.