957 So.2d 795 (2007)
Christopher CASCIO
v.
James Burke DOWNING, M.D.
No. 2006-CA-0570.
Court of Appeal of Louisiana, Fourth Circuit.
April 4, 2007.
*797 W. Chad Stelly, Blake G. Arata, Jr., C. Perrin Rome III, Rome, Arata & Baxley, LLC, New Orleans, LA, for Plaintiff/Appellee.
Richard L. Weil, Gerald F. Arceneaux, Guste, Barnett & Shushan, L.L.P., Bourg, LA, for Defendant/Appellant.
(Court composed of Judge MICHAEL E. KIRBY, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR.).
TERRI F. LOVE, Judge.
Dr. James Burke Downing appeals the district court's ruling that he breached the applicable standard of care in his treatment of Mr. Christopher Cascio and that the breach was a cause-in-fact of Mr. Cascio's damages. The trial court found in favor of Mr. Cascio and against Dr. Downing. The trial court was correct in its holding that Dr. Downing breached the applicable standard of care and that the breach was a cause-in-fact of plaintiff's damages. Therefore, we find the trial court was neither manifestly erroneous nor abused its discretion. The decision of the trial court is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
In June 1996, the appellee, Mr. Christopher Cascio (hereinafter "Mr. Cascio"), a 28-year-old male, who had been a competitive weight-lifter and body-builder, presented to Dr. James Burke Downing (hereinafter "Dr. Downing"), complaining of persistent, painful lumps in both breasts. Mr. Cascio informed Dr. Downing that he had a family history of breast cancer that concerned him and expressed that the visible lumps in his chest were not aesthetically pleasing to him.
A mammogram and an echogram were performed on Mr. Cascio and revealed that he had gynecomastia of the left breast. A consent form was prepared by Dr. Downing's office and was signed by Mr. Cascio; the form set forth in general terms the nature and purpose of the procedure of bilateral subcutaneous mastectomies to be performed by Dr. Downing on Mr. Cascio, as the removal lumps from both breasts. Also, two blocks of a Mercy Baptist Hospital *798 disclosure form were checked off-"excisional breast biopsy" and "lumpectomy (partial excision of breast) with axillary dissection, however, Mr. Cascio signed only the block pertaining to "excisional breast biopsy." The excisional breast biopsy block that Mr. Cascio signed disclosed the risks of infection, blood clot (hematoma), failure to obtain accurate diagnosis, disfiguring scar, and failure to locate and remove abnormality.
During the procedure, Dr. Downing buttonholed the breast skin of Mr. Cascio on both sides. Upon discharge, Mr. Cascio was instructed to resume normal activities as tolerable, and to rest and refrain from strenuous activity. A follow-up visit was scheduled. Following discharge and prior to the scheduled follow-up, Mr. Cascio felt an unusual sensation in his right breast and went to the emergency room at Chalmette Medical Center. He was diagnosed with a hematoma of the right breast at the surgical site and was prescribed antibiotics and instructed to attend his previously scheduled follow-up visit with Dr. Downing.
In his office, Dr. Downing attempted to remove the hematoma, but was unsuccessful. He instructed Mr. Cascio to return to Mercy Baptist Hospital for evacuation of the hematoma. A second surgery was performed on Mr. Cascio's right breast to evacuate the hematoma.
Subsequently, Mr. Cascio returned to Mercy Baptist Hospital, complaining of pain and swelling in his left breast. Dr. Downing's partner, Dr. Walsh, examined Mr. Cascio and discovered a hematoma in his left breast. Dr. Walsh evacuated an ounce of blood or greater from the left surgical site and attached steri-strips to the site. Mr. Cascio remained under post-operative care with Dr. Downing until his condition improved and he was discharged.
Dr. Thomas Crais (hereinafter "Dr. Crais"), a plastic surgeon, treated Mr. Cascio, and noted that he suffered from diminished sensation in both nipple areolar complexes, had total lack of sensation in the left nipple, and that both of his breasts remained hypertrophic. Dr. Crais prescribed topical treatment, including injections.
Mr. Cascio filed a request for a review of his medical malpractice claim, and a medical review panel was convened to examine the issue of whether Dr. Downing's conduct fell below the applicable standard of care. The medical review panel was composed of Dr. Alberto Arrillaga (hereinafter "Dr. Arrillaga"), Dr. Allen Stolier (hereinafter "Dr. Stolier"), and Dr. Michael Friley (hereinafter "Dr. Friley"). One physician was selected by the plaintiff, Dr. Arrillaga; one physician was selected by the defendant, Dr. Stolier; and a third physician was selected by Drs. Arrillaga and Stolier together, Dr. Friley.
Drs. Arrillaga and Friley were of the opinion that the evidence supported the conclusion that Dr. Downing failed to meet the applicable standard of care. Dr. Stolier disagreed; Dr. Stolier opined that the multiple complications of the operation led to disfiguring scars and the patient was informed of the complications of bleeding and scarring prior to the operation and consented to the procedure.
The final opinion of the medical review panel stated that Dr. Downing demonstrated a lack of skill in performing the procedure on Mr. Cascio. The panel opined Dr. Downing's buttonholing of the skin flaps, burning of the skin with electrocautery, and failure to adequately achieve hemostasis were factors in the resultant disfiguring scars. Also, the panel opined that the care provided by Dr. Downing fell below the standard of care required, and that breach *799 of the standard of care caused Mr. Cascio to suffer expansive scarring.
The trial judge found in favor of Mr. Cascio and against Dr. Downing, and opined that Dr. Downing breached the applicable standard of care and that the breach was a cause-in-fact of plaintiff's damages. The trial court rendered judgment in the amount of $60,000.00 in general damages and $8,367.89 in special damages, plus interest and court costs. This appeal followed.

LAW AND DISCUSSION
Dr. Downing asserts that the trial court erred in finding that he violated the standard of care for general surgeons and that the breach of the standard of care was the cause-in-fact of the damages claimed by Mr. Cascio. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. Gordon v. La. State University Bd. of Supervisors, 27,966, p. 4 (La.App. 2 Cir. 3/1/96), 669 So.2d 736, 739-40, (citing White v. McCool, 395 So.2d 774 (La.1981)); La.Rev.Stat. 9:2794.

COMPETING MEDICAL TESTIMONY
Dr. Downing argues that the third member of the panel opined that he did not breach the standard of care and was not responsible for the injuries. A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and to use reasonable care, diligence, and judgment. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 718 (La.1986). "In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact." Hubbard v. State, 02-1654, p. 11 (La.App. 4 Cir. 8/13/03), 852 So.2d 1097, 1103. Where medical experts express differing views, judgments and opinions, great deference is given to the fact-finder's determinations, which should not be reversed on appeal unless a reviewing court concludes that no reasonable factual basis for them exists. Id.
The medical review panel consisted of one physician selected by the plaintiff, Dr. Arrillaga; one physician selected by the defendant, Dr. Stolier; and a third physician selected by Drs. Arrillaga and Stolier together, Dr. Friley. The medical review panel heard testimony and reviewed evidence regarding whether Dr. Downing breached the standard of care owed Mr. Cascio.

OPINION OF THE MEDICAL REVIEW PANEL
The panel majority was comprised of two of the three members of the panel, Drs. Arrillaga and Friley. While the panel's written opinion did not distinguish the individual opinions of these two doctors, Dr. Friley later testified in court as to his own medical opinion. The panel's opinion was that the evidence supported the conclusion that Dr. Downing breached the requisite standard of care and that the breach caused Mr. Cascio to suffer extensive scarring that would not have occurred had the surgery been performed correctly. The majority panel members opined that Dr. Downing lacked demonstration of skill in performing the procedure, where he buttonholed skin flaps, burned the skin with electrocautery, and failed to properly obtain hemostasis. Dr. Stolier disagreed.

*800 MEDICAL OPINION AND TESTIMONY OF DR. STOLIER
After reviewing evidence and hearing testimony in the medical review panel process, Dr. Stolier, the third member of the panel, who was appointed by Dr. Downing, disagreed with the consensus of Drs. Friley and Arrillaga in the official opinion of the panel. Dr. Stolier opined that the evidence did not support the conclusion that Dr. Downing did not meet the requisite standard of care as charged in the complaint. The opinion states that Dr. Stolier reasoned that based on the operative report, Dr. Downing performed the correct procedure in a timely and proper fashion. The panel's opinion also states that Dr. Stolier thought that Mr. Cascio consented to the procedure and was preoperatively informed of the complications of bleeding and scarring that Mr. Cascio endured due to various problems during the procedure.
Dr. Stolier later testified that Mr. Cascio's injuries, scarring and bleeding, are known complications of surgery. However, as to the issue of the causal connection between the breach and the resulting disfigurement, Dr. Stolier stated that multiple complications of the operation led to the disfiguring scars suffered by Mr. Cascio.

TESTIMONY OF DR. FRILEY
Dr. Friley testified at trial that Dr. Downing used bad surgical technique and stated that his failure to achieve hemostasis caused the surgical wounds to heal improperly. He also testified that cutting through the skin overlaying the breast while attempting to excise breast tissue caused additional scarring that would not have occurred had a carefully performed surgical procedure been done.

TESTIMONY OF DR. WALSH
Dr. John Walsh (hereinafter "Dr. Walsh") testified on behalf of Dr. Downing. He stated that buttonholing the skin in removing the tissue was not a violation of the standard of care because it is part of the risk of an operation and involves many factors, including the thickness of the skin, the amount of bleeding that the patient has, and the adherence of the breast tissue to the skin. Dr. Walsh opined that the bleeding is a known and expected complication of the procedure.
Based on the evidence presented at trial and the expert testimony, reasonable minds can differ as to whether Dr. Downing deviated from the standard of care required of him and this breach of standard was the cause-in-fact of the injuries sustained by Mr. Cascio. We cannot say that the trial judge was clearly erroneous to accept the opinions of Drs. Arillaga and Friley on the issue of whether a breach occurred and reject the premise and conclusions of Drs. Stolier and Walsh on that particular issue. The evidence and testimony of Drs. Arrillaga and Dr. Friley established that the standard of care owed by Dr. Downing to Mr. Cascio was breached.
Further, as to the causal relationship between the breach and the resulting damages, Dr. Stolier, the appellant's own medical review appointee, partially contributed to the establishment of the causal relationship between the breach and the resulting disfigurement when he opined that multiple complications of the operation led to the disfiguring scars suffered by Mr. Cascio. As stated above, Dr. Friley testified that the additional scarring suffered by Mr. Cascio would not have resulted had Dr. Downing carefully performed the procedure. Where there is a conflict in the testimony, reasonable evaluations of *801 credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Burns v. UHS of New Orleans, Inc., 02-1514, p. 11 (La.App. 4 Cir. 2/19/03), 841 So.2d 51, 58. We find that the trial court's decision was not manifestly erroneous.

INFORMED CONSENT
The trial court held that informed consent does not apply because a breach of the applicable standard of care occurred. Dr. Downing contends that the trial court erred in its holding, and to support this contention, he maintains that Mr. Cascio suffered from a "known complication" of the procedure that was performed on him, to which Mr. Cascio consented. Dr. Downing also states that the possible complications associated with the subject procedure include possible scarring and bleeding, which were stated on consent forms signed by Mr. Cascio prior to surgery.
Notwithstanding the finding of a breach of the standard of care, a consent form that has been signed may be presumed valid and effective absent proof that its execution was induced by misrepresentation of material facts. La.Rev.Stat. 40:1299.40(A)(1). The Louisiana Supreme Court has found a doctor's duty is to disclose to a patient those risks that are material. Jackson v. State, 05-2021, p. 2 (La.9/29/06), 938 So.2d 688, 689-90 (citing Hondroulis v. Schuhmacher, on reh'g, 553 So.2d 398, 421 (La.1989)). Also, according to La.Rev.Stat. 40:1299.40, when obtaining informed consent, technical language will not ordinarily suffice to disclose a risk to a layperson; rather, a doctor is required to disclose material risks in such terms that a reasonable person in the patient's position would understand, unless the doctor knows or should have known something peculiar to the patient or her circumstances prevented her from understanding. Jackson, 05-2021, p. 3, 938 So.2d at 690.
Specifically, La.Rev.Stat. 40:1299.40 required Dr. Downing to use a form that: 1) sets forth in general terms the nature and purpose of the procedure or course of procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars (emphasis added) associated with such procedure or procedures; and 2) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and, 3) is signed by the patient for whom the procedure is to be performed.
At trial, the parties disagreed as to whether Dr. Downing properly informed Mr. Cascio of all risks associated with the surgery. However, the forms do not reveal that buttonholing of the skin flap on both sides, burning the skin with electro-cautery, and inadequately obtaining hemostasis were complications that were either contemplated or discussed prior to the procedure. Further, the record does not reveal that Dr. Downing disclosed to Mr. Cascio the risk of the additional surgeries that were performed on Mr. Cascio after the medical error. Specifically, the patient consent form prepared by Dr. Downing indicated that an attachment for risks identified by the Louisiana Medical Disclosure Panel was included. Additional risks were noted on the form and were listed as "infection, bleeding, pain, and recurrence."
Dr. Downing submits that Dr. Walsh, a defense witness, stated that Mr. Cascio's injuries are "known complications" of the surgery to which he consented. However, Dr. Stolier testified that while burning through the skin is a *802 "known complication" of the mastectomy, it is not an expected complication of the procedure. Nevertheless, the applicable standard of care requires a physician to look for known complications of medical procedures, to take notice of them, act upon patient information related by other physicians, and assist patients in the management of post-operative medical problems. Turner v. Stassi, 33,022, p. 6 (La. App. 2 Cir. 5/10/00), 759 So.2d 299, 304.
In the instant case, Dr. Downing failed to advise Mr. Cascio of the risk of buttonholing of the skin, disfiguring scars, or additional surgeries. Dr. Friley testified that the additional scarring suffered by Mr. Cascio would not have resulted had Dr. Downing carefully performed the procedure. Dr. Downing has failed to prove that the materialized risks endured by Mr. Cascio were known complications to which Mr. Cascio consented. Also, Dr. Downing has not established that the medical errors that resulted from a failure to carefully perform the surgery were within the standard of care. Therefore, Dr. Downing's argument that Mr. Cascio consented to a known complication is without merit. We find no error in the trial court's decision.

BIAS OF MEDICAL REVIEW PANEL
Dr. Downing alleges that the medical review panel was tainted and the opinion was prejudiced by the failure of Dr. Arrillaga to recuse himself from the panel. Dr. Downing contends that as a result of his testimony in a prior matter, Dr. Arrillaga faced disciplinary action. Dr. Downing asserts that the bias against him was further evidenced in trial by testimony that Dr. Arrillaga had an axe to grind with Dr. Downing. Dr. Downing also maintains that Drs. Arrillaga and Friley were partners operating in the same office to further support his allegations that the panel was biased.
Claims alleging medical malpractice are governed by La.Rev.Stat. 40:1299.41, et seq. Under the Louisiana Medical Malpractice Act, all medical malpractice claims against qualified health care providers must be submitted to a medical review panel for consideration. La.Rev.Stat. 40:1299.47(A)(1). Further, no civil action against a qualified health care provider or its insurer may be commenced in any court before the claimant's proposed complaint has been presented to a medical review panel established pursuant to the Act. La. Rev.Stat. 40:1299.47(B)(1)(a)(i).
The medical review panel is composed of one physician selected by the plaintiff and one physician selected by the defendant. La.Rev.Stat. 40:1299.47(C)(3)(f)(ii). A third health care provider panel member is then selected by the first two members. La. Rev.Stat. 40:1299.47(C)(3)(d). Each panelist is required to take an oath swearing to perform his duties without partiality or favoritism and to recognize that he represents neither side. La.Rev.Stat. 40:1299.47(C)(5).
The proper method to challenge a medical review panelist is by motion to the trial court. Ortego v. Jurgelsky, 98-1622, p. 11 (La.App. 3 Cir. 3/31/99), 732 So.2d 683, 689. Therefore, as a dispositive issue, we must consider whether Dr. Downing has made a timely challenge to the medical review panelists. In Moore v. Wal-Mart, Inc., the plaintiffs alleged that the jury was tainted by the testimony of Dr. Shames who appeared on the medical review panel because the defendant had been a resident under Dr. Shames; however the plaintiffs did not make any objections at trial nor did they make any motion for the trial court to rule on the issue. 98-1806, p. 5 (La.App. 4 Cir. 3/10/99), 729 So.2d 187, 189-90. This Court found the allegations of taint without merit and opined that the plaintiffs had adequate time prior to the *803 trial to have discovered this information and that the proper time to raise this issue was at the medical review panel level. Id.
Dr. Downing raised an objection to the panel's composition after the panel rendered its decision. Further, Dr. Downing offered no evidence at trial to establish that he was prevented, prior to the rendition of the panel opinion, from learning of the alleged bias. Therefore, the trial court did not err in deciding that the challenge was untimely. As to the trial court's finding of no conflict, we pretermit discussion of this issue because we find the challenge was untimely.

DAMAGES
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded it in awarding damages. Adler v. American Nat. Property and Cas. Co., 99-3182, p. 5 (La.App. 4 Cir. 9/20/00), 769 So.2d 698, 701-02. This determination is made with consideration to the individual circumstances of the injured plaintiff. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). After an analysis of the facts and circumstances peculiar to the particular case and the particular plaintiff, an appellate court may conclude that the award is inadequate (or excessive). Davis v. Louisiana Power & Light Co., 00-13 (La.App. 5 Cir. 5/17/00), 762 So.2d 229, 236-37; Theriot, 625 So.2d at 1340. Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Davis, 00-13, 762 So.2d at 237; Theriot, 625 So.2d at 1340. Further, for an appellate court to reduce or increase an award of general damages, the award must be so low or high in proportion to the injury that it "shocks the conscience." Davis v. Allstate Property & Cas. Ins. Co., 05-0980, p. 13 (La.App. 4 Cir. 9/13/06), 941 So.2d 602, 610.
In his fourth and final assignment of error, the appellant submits that the trial court's assignment of damages was erroneous. The trial court made a special damage award of $8,372.89 for the medical bills that the parties stipulated to. Also, the court awarded general damages in the amount of $60,000.
Dr. Downing's breach caused Mr. Cascio to incur medical expenses from medical treatment that he, more probably than not, would not have received had the breach not occurred, which supports the trial court's special damage award. Further, we find that the trial court's award of $60,000 for Mr. Cascio's disfigurement and pain and suffering is not "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances," Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993). The trial court has great, even vast, discretion in the assessment of general damages. Id., 623 So.2d at 1260-61. When Mr. Cascio consulted Dr. Downing, one surgery was contemplated. However, the evidence shows that the breach in the standard of care required Mr. Cascio to undergo two additional procedures. Mr. Cascio had hematomas removed from his chest on several occasions. Also, Mr. Cascio was a body builder and suffered disfiguring scars on chest; he felt that the visible scars on his chest were unattractive. As a result of the breach, Mr. Cascio endured eleven additional months of pain and suffering. Therefore, given the facts and evidence in the case at bar, we find that the trial court's damage award is not an abuse of discretion.

*804 DECREE
Accordingly, we conclude that the trial court was not manifestly erroneous in its decision that Dr. Downing breached the applicable standard of care and that the breach was a cause-in-fact of plaintiff's damages. Also, the trial court's award of damages is not an abuse of discretion. The judgment of the trial court is affirmed.
AFFIRMED.