966 So.2d 91 (2007)
Keoka PARQUETTE
v.
CERTIFIED COATING OF CALIFORNIA, INC. and Markel Insurance Company.
No. 2006-CA-1527.
Court of Appeal of Louisiana, Fourth Circuit.
August 22, 2007.
*92 Robert G. Harvey, Sr., Law Office of Robert G. Harvey, Sr., APLC, New Orleans, LA, and Albert J. LeBeouf, Albert J. LeBeouf, A.P.L.C., Abita Springs, LA, for Keoka Parquette.
Craig R. Nelson, Nelson Fay, LLC, and Harry T. Lemmon, New Orleans, LA, for Certified Coatings of California, Incorporated, and Evanston Insurance Company.
Court composed of Judge DENNIS R. BAGNERIS, SR., Judge TERRI F. LOVE, Judge EDWIN A. LOMBARD.
TERRI F. LOVE, Judge.
This appeal arises from an accident on the Crescent City Connection Bridge where a broken cable struck a vehicle during the performance of bridge maintenance. Keoka Parquette was driving her vehicle when a steel cable struck her vehicle, allegedly caused her injuries. Keoka Parquette filed suit against Certified Coatings of California, Inc., the contractor performing the work, and, its insurer, Evanston Insurance Company. Keoka Parquette then filed a motion for partial summary judgment and/or to strike the affirmative defense of third-party negligence and for expedited rehearing. The trial court granted the partial motion for summary judgment and prohibited Certified Coatings of California, Inc. from introducing evidence of third-party negligence or defectiveness of the steel cable. The jury found in favor of Keoka Parquette and awarded damages. Certified Coatings of California, Inc. appeals the trial court's granting of the partial motion for summary judgment and the jury's verdict. We find that the partial motion for summary judgment and damage awards were proper and affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
On May 23, 2003, Keoka Parquette ("Ms. Parquette") was driving to work across the Crescent City Connection Bridge ("CCC") when a half-inch steel cable, used for work on the CCC, snapped and struck her vehicle. Ms. Parquette allegedly sustained physical and mental injuries as a result.
Ms. Parquette filed a petition for damages against Certified Coatings of California, Incorporated ("Certified Coatings"), the contractor, and Markel Insurance Company ("Markel"), whom she believed to be Certified Coatings' insurer, alleging *93 that Certified Coatings' negligence caused her injuries. Ms. Parquette asserted that a "vice, defect, and/or ruins" existed on the CCC in the area where Certified Coatings performed work. Certified Coatings' insurer, erroneously referred to as Markel, was Evanston Insurance Company ("Evanston"). Ms. Parquette also plead the doctrine of res ipsa loquitor.
Certified Coatings and Evanston ("Defendants") asserted that "the acts of third persons not named in this lawsuit caused or contributed to the accident." Certified Coatings identified the supplier of the cable as Nautilus Supply Company ("Nautilus Supply") and stated, during discovery, that "[n]one of the thousands of feet of cable supplied to Certified Coatings ever wore down and snapped like the cable made the subject of this lawsuit. . . ." Certified Coatings further alleged that Nautilus Supply "failed to supply subject cable which was fit for intended purpose" and that the cable "obviously had an inherent flaw and/or defect at the time it was supplied."
The parties filed a joint stipulation, stating in pertinent part, "[a] cause of the accident that is the subject of this litigation was the negligence of Certified Coatings of California, Inc." Thereafter, Ms. Parquette filed a motion in limine regarding the spoliation of evidence. The trial court deferred a ruling until trial. Ms. Parquette then filed a motion for partial summary judgment and/or to strike the affirmative defense of third-party negligence and for expedited hearing. Certified Coatings opposed the motion and offered the affidavit of its president[1] and submitted the documentary evidence of the cable's specifications and order forms showing that Certified Coatings had obtained the cable from Nautilus Supply.
The trial court granted Ms. Parquette's motion for partial summary judgment and ordered that Certified Coatings "may not introduce any evidence to support their claim of third-party negligence of Nautilus Supply or the defectiveness of the cable as a proximate cause of the accident made the subject of this lawsuit." The trial court ruled that there was no just reason for delay of entry of a final judgment pursuant to La. C.C.P. art. 1915(B)(1). Certified Coatings timely appeal followed. Due to the pending appeal, Certified Coatings filed a motion to continue trial, which the trial court denied.
After a three-day jury trial, the jury awarded Ms. Parquette $800,000 for past and future physical pain and suffering; $100,000 for past and future mental pain and suffering; $80,000 for future medical expenses; $36,000 for lost wages/income up to trial; $100,000 for loss of enjoyment of life; and $68,000 for medical expenses up to trial. The trial court judge entered judgment on the verdict. Certified Coatings combined this appeal with the appeal on the motion for partial summary judgment.
Certified Coatings asserts the trial court erred by granting the motion for partial summary judgment and preventing the presentation of evidence regarding third-party evidence and asserts that the damage awards were abusively high and unsupported by the evidence.

STANDARD OF REVIEW
Summary judgments are reviewed using the de novo standard. Huggins v. Gerry Lane Enters., Inc., 06-2816, p. 3 (La.5/22/07), 957 So.2d 127, 128. The trial court will grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions *94 on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(B). The mover bears the burden of proof. La. C.C.P. art. 966(C)(2).
"The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded it in awarding damages." Cascio v. Downing, 06-0570, p. 12 (La.App. 4 Cir. 4/4/07), 957 So.2d 795, 803. "[A]n appellate court may conclude that the award is inadequate (or excessive)" after reviewing the particular facts and circumstances of a case. Id.
Appellate courts review factual findings of the trial court or jury using the "manifest error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). The appellate court must determine if the factfinder's decision was a reasonable one. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). "The rationale for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses, as compared with the appellate court's access only to a cold record, but also upon the proper allocation of trial and appellate functions between the respective courts." McElveen v. City of New Orleans, 03-1609, p. 4 (La. App. 4 Cir. 9/14/04), 888 So.2d 878, 881. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.

PARTIAL MOTION FOR SUMMARY JUDGMENT
This Court held that "a motion for summary judgment should not be determined based on testimony that is `mere speculation.'" Skinner v. Derr Constr. Co., 05-0816, 05-0817, p. 9 (La. App. 4 Cir. 7/26/06), 937 So.2d 430, 436, quoting Jones v. Estate of Santiago, 03-1424, p. 10 (La.4/14/04), 870 So.2d 1002, 1008. Further, in Keller v. Messina, 05-745, p. 5 (La.App. 3 Cir. 2/1/06), 921 So.2d 1162, 1165, the court held that the speculative evidence failed "to indicate that the defendants" would be able to demonstrate comparative fault at trial.
In the case sub judice, Certified Coatings' alleged evidence of Nautilus' negligence consists of a receipt for the purchase of the allegedly defective cable, the testimony of Certified Coatings' president, and the testimony of employees that the ends of the cable appeared frayed following the accident. The record indicates that no experts or anyone other than Certified Coatings examined the cable, which has since been lost. Additionally, no experts would testify at trial regarding the allegedly defective nature of the cable. We find Certified Coatings' evidence speculative.
The trial court prevented Certified Coatings' presentation of Nautilus' negligence. However, the trial court held that "[t]his Judgment does not preclude defendant from using evidence as to the physical properties of the cable," which encompasses the evidence possessed by Certified Coatings. Thus, we find that the partial motion for summary judgment was properly granted.

QUANTUM
The jury awarded Ms. Parquette $800,000 for past and future physical pain and suffering; $100,000 for past and future mental pain and suffering; $80,000 for future medical expenses; $36,000 for lost wages/income up to trial; $100,000 for loss of enjoyment of life; and $68,000 for medical expenses up to trial. The jury did not award Ms. Parquette damages for future lost wages or loss of earning capacity. Certified Coatings contends that the *95 awards for general damages, future medical expenses, and past income were excessive. Ms. Parquette avers that the jury erred in refusing to award future lost wages and loss of earning capacity.

Ms. Parquette
Ms. Parquette testified that she attended some classes at Delgado towards a major in nursing prior to the accident. At the time of the accident, she stated that she felt that "death had arrived." Ms. Parquette testified that she "no longer wanted to drive" after the accident. Further, Ms. Parquette was out of work for over a year.
A few days after the accident, Ms. Parquette allegedly started to experience some pain. She went to see Dr. William Alden ("Dr. Alden"), as referred by her attorney, with complaints of pain in her neck, numbness, shaking, tingling, nervousness, and headaches. Dr. Alden recommended medication and therapy treatment. He also referred Ms. Parquette to a psychiatrist, Dr. Roger Anastasio ("Dr. Anastasio"). Later, Dr. Alden recommended x-rays and an MRI. Ms. Parquette testified that the MRI took three and a half hours, due to her "nervousness" and "fright." The MRI revealed a bad disk in her neck that was pinching a nerve.
Dr. Alden then referred Ms. Parquette to Dr. Kenneth Vogel ("Dr. Vogel"), who requested an MRI of her back, cervical myelogram, and a CAT scan. She stated that the test results required surgery. Prior to the surgery, doctors warned her that she would suffer from pain for the rest of her life and that another surgery might be required after she got older. Ms. Parquette stated that the warnings made her feel "unhappy" and that she was "better being dead." The surgery removed a disk from her neck, replaced it with a bone, and then fastened it to her spinal cord. Ms. Parquette testified that she had permanent restrictions on "hyper-bending her neck repeatedly, cervical strain, bending consecutively," and that she could not lift anything over thirty-five pounds without increasing the pain.
On cross-examination, Ms. Parquette stated that she was not presently seeing a psychiatrist because of Hurricane Katrina displacement and that all treatment stopped as of July 2005. She also testified that she was making more money now than she was before the accident. Ms. Parquette stated that she still has uncontrollable muscle spasms and arm pain. As to disability, Ms. Parquette testified that she was ten to fifteen percent disabled. Finally, Ms. Parquette stated that she takes Goody's, Tylenol, and ibuprofen as needed for pain and headaches.

Dr. Alden
Dr. Alden, an expert in internal medicine, testified that he first examined Ms. Parquette on May 28, 2003, with complaints of neck pain, numbness in her left hand, left foot, pain, and some nervousness. Following a physical examination, Dr. Alden diagnosed Ms. Parquette with "coup-contra-coup and posttraumatic stress, cervical strain, thoracic strain, left hand strain, and left foot strain." Ms. Parquette continued to have pain and numbness at her second appointment with Dr. Alden. After the visit, Dr. Alden testified that he referred her to Dr. Anastasio and told her to continue physical therapy. Dr. Alden stated that he ordered a cervical MRI after Ms. Parquette's fourth visit. The MRI revealed a herniation between the C4 and C5 vertebrae, which Dr. Alden testified was consistent with the accident. He referred Ms. Parquette to a neurosurgeon, Dr. Vogel, for surgical evaluation. Dr. Alden further stated that more likely than not, Ms. Parquette's injuries were from the accident.

*96 Dr. Vogel

Dr. Vogel, Ms. Parquette's expert in neurosurgery, testified that he examined Ms. Parquette for pain, muscle spasms, and numbness. He stated that his findings were related to the accident. Dr. Vogel suggested a myelogram CAT scan for a "more definitive diagnosis." Dr. Vogel testified that the myelogram revealed a spur and disk mixed at the C4-C5 vertebrae and a disk protrusion at the C5-C6 vertebrae. Dr. Vogel "[o]ffered and anticipated an anterior cervical fusion at the C5-6 level" where Ms. Parquette's spinal cord was indented. Six weeks after the surgery, Dr. Vogel suggested that Ms. Parquette begin physical therapy. Further, he stated that surgery might be needed in the future on the C4-C5 injury, which would cost approximately $57,000 to $60,000.
At maximum medical improvement, Dr. Vogel testified that Ms. Parquette would be unable to lift, push, or pull anything over thirty-five pounds. He stated that she had ten to fifteen percent whole body impairment. Due to this, Dr. Vogel stated that Ms. Parquette would probably have difficulty getting through nursing school, but that she would be able to find a job upon graduation. Finally, Dr. Vogel stated that Ms. Parquette's injuries do not prevent her from working full-time.

Dr. Robert Steiner
Dr. Robert Steiner ("Dr. Steiner"), the defense expert in orthopedic medicine, testified that he performed an examination of Ms. Parquette. He stated that the MRI showed a mid-line bulge at the C4-C5 vertebrae, but no C5-C6 vertebrae problems. His x-rays revealed a cervical fusion at the C5-C6 vertebrae. Dr. Steiner stated that he saw no reason for the C5-C6 fusion. On cross examination, Dr. Steiner acknowledged a protrusion at the C4-C5 vertebrae, but reiterated that he did not think the cervical fusion at the C5-C6 was warranted.

Dr. Richard Roniger
Dr. Richard Roniger ("Dr. Roniger"), the defense expert in psychiatry, testified that he did not think Ms. Parquette suffered from posttraumatic stress disorder. However, Dr. Roniger stated that Ms. Parquette was still having symptoms in 2005, when he examined her.

CPA Testimony
John Theriot ("Accountant Theriot"), Ms. Parquette's CPA and CFA expert, testified that Ms. Parquette's past loss of wages/earnings was $37,477. He stated that she had a future loss of wages/earnings of $136,787. As for medical expenses, he calculated a future loss of medical as $8,114 with additional money needed if a future surgery was required. On cross examination, Accountant Theriot stated that he used June 2004 to June or July 2005 as his computation time. Further, he testified that he was unaware that Ms. Parquette was only taking Tylenol and Advil. This information, he stated, made his future medical calculations incorrect.
Dan Cliffe ("Accountant Cliffe"), the defense CPA expert in economic analysis, testified that Ms. Parquette's past loss of wages/earnings was $25,930. Accountant Cliffe did not calculate any future loss because he stated that Ms. Parquette can perform the same job that she had prior to the accident.
As to general damages, the jury heard testimony from Ms. Parquette regarding her physical and mental suffering as a result of her injuries. The jury also heard testimony from Dr. Alden, Dr. Vogel, Dr. Steiner, and Dr. Roniger regarding their respective diagnoses and treatment of Ms. Parquette. Ms. Parquette stated after learning about her surgery, that she was "better being dead" and that she was ten *97 to fifteen percent disabled. Dr. Vogel testified that he performed a cervical fusion on Ms. Parquette to relieve most of her symptoms from the disk protrusion and that Ms. Parquette may need surgery in the future to correct the spur and disk mix at the C4-C5 vertebrae. Dr. Steiner acknowledged the disk protrusion, but stated that he did not think cervical fusion was necessary. Finally, Dr. Roniger testified that he did not think Ms. Parquette suffered from posttraumatic stress disorder, but that she was exhibiting psychological symptoms. The jury was in the best position to weigh the credibility of Ms. Parquette and the experts in order to determine that $900,000 was a reasonable award.
Accountant Theriot calculated Ms. Parquette's future medical expenses at $8,114 with additional money required if a future surgery became necessary. However, when calculating the total, Accountant Theriot included the cost of prescription medication and not the cost of Tylenol, Advil, or Goody's that Ms. Parquette was actually taking for pain. Dr. Vogel testified that a future surgery would cost around $57,000 to $60,000. Dr. Vogel also stated that $8,114 was a reasonable amount for Ms. Parquette's future prescriptions. Accordingly, the jury weighed the credibility of the information and awarded $80,000 for future medical expenses.
The jury awarded $36,000 for lost wages/income up to the trial date. Accountant Theriot stated, taking into account what Ms. Parquette had earned, that her past loss of wages was $37,477. Accountant Cliffe testified that Ms. Parquette's past loss of wages was $25,930. Considering the jury's position to better ascertain the credibility of witnesses and the conflicting testimony, we do not find that the award of $36,000 was unreasonable.
We do not find that the general damages, future medical expenses, and past income awards were unreasonable. The jury weighed the opinions from opposing experts and Ms. Parquette. It is uncontroverted that she suffered physical and mental harm and that she could not work for one year as a result of the accident.
The jury did not find that Ms. Parquette was entitled to awards for future lost wages or loss of earning capacity. Accountant Theriot stated that Ms. Parquette's future lost wages would be $136,787. Accountant Cliffe testified that he did not calculate any future lost wages because Ms. Parquette can perform the same job that she had prior to the accident. The jury heard testimony as to Ms. Parquette's intent to become a nurse; she attended one year of pre-nursing courses at Delgado. However, Dr. Vogel testified that finishing nursing school may be difficult due to Ms. Parquette's weight lifting restrictions; but, that once she graduated she could obtain a nursing position that did not require heavy lifting. Ms. Parquette was employed, at the time of trial, with a higher salary than that prior to the accident. Accordingly, given the jury's ability to weigh the credibility of testimony, we do not find that the jury committed manifest error or abused its discretion in refusing to award damages for future lost wages or loss of earning capacity.

DECREE
For the above mentioned reasons, we affirm the trial court judgments.
AFFIRMED.
BAGNERIS, J., dissents with reasons.
*98 BAGNERIS, J., dissenting.
I respectfully dissent from the majority opinion, as I would find that the trial court erred when it granted plaintiff's motion for partial summary judgment, striking defendants' defense of third-party negligence. Louisiana law provides that defendants are entitled to have damages apportioned among all persons causing injury to plaintiff and thus, the trial court erred when it denied defendants the opportunity to present their evidence regarding the defective condition of the cable to the jury. See La. C.C. Art. 2323[1]. Further, the Louisiana Supreme Court in Dumas v. State ex rel. Dept. of Culture, Recreation & Tourism, XXXX-XXXX (La.10/15/02),828 So.2d 530, held that La. C.C. Art. 2323 "clearly requires that the fault of every person responsible for a plaintiff's injuries be compared, whether or not they are parties, regardless of the legal theory of liability asserted against each person." Id. at p. 11, 828 So.2d at 537. In the instant case, defendants specifically pled the fault of third parties as a cause of the plaintiff's accident and injuries as an affirmative defense in its answer to plaintiff's petition for damages. Pursuant to La. C.C. Art. 2323, and the Louisiana Supreme Court's holding in Dumas, defendants were entitled to present evidence regarding the defective condition of the cable that snapped to the jury, and the jury should have determined whether any nonparty tortfeasors should bear a portion of the fault in this case. Therefore, I would find that the trial court erred as a matter of law by granting the partial summary judgment striking defendants' defense of third-party negligence and keeping the issue from the jury.
NOTES
[1] The president of Certified Coatings is a mechanical engineer.
[1] Louisiana Civil Code Article 2323 states in part:

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.