TERRI F. LOVE, Judge.
| .¿This appeal arises from injuries sustained as a result of alleged medical malpractice resulting in avascular necrosis and bilateral hip replacement. We find that the jury did not commit manifest error and affirm. However, we find that the trial court erred by awarding damages for future pain and suffering and reverse.

*1125
FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Juliette Vappie learned that she was suffering from a miscarriage in August 1996. After becoming upset about the miscarriage, Mrs. Vappie began to experience urticaria.[1] After taking Benadryl, Mrs. Vappie telephoned her doctor for an appointment, but he was unavailable. However, Dr. Marianne Maumus was able to see Mrs. Vappie. James Vappie, Mrs. Vappie’s husband, drove Mrs. Vappie to see Dr. Maumus. After meeting with Mrs. Vappie, Dr. Maumus concluded that Mrs. Vappie was suffering from urticaria and prescribed Vistaril and prednisone. Mrs. Vappie took approximately twenty seven of the forty prescribed prednisone pills. In April 1997, Mrs. Vappie was diagnosed with bilateral avascular necrosis[2] (“AVN”). As a result, Mrs. Vappie underwent a left hip replacement surgery in November 1997, and a right hip replacement surgery in December 2003.
Mrs. Vappie filed a complaint against Dr. Maumus alleging that the AVN was 13steroid induced. However, the medical review panel (“MRP”) found that Dr. Mau-mus did not fail to meet the applicable standard of care by prescribing predni-sone. Accordingly, Mr. and Mrs. Vappie then filed a petition for damages against Dr. Maumus and the Louisiana Patient’s Compensation Fund (“LPCF”).
Following a jury trial, the jury returned a verdict in favor of Mr. and Mrs. Vappie and attributed seventy-five percent of fault for Mrs. Vappie’s injuries to Dr. Maumus. The jury also awarded damages as follows:
Past medical expenses $111,444.32
Lost wages $30,726.56
Pain and suffering $250,000
Loss of enjoyment of life $100,000
Future medical expenses $150,000
Loss of consortium (Mr. Vappie) $50,000
Total $692,170.88
Considering Mrs. Vappie’s percentage of fault, the jury awarded $519,128.16 from Dr. Maumus and the LPCF. Both Dr. Maumus and Mr. and Mrs. Vappie filed motions for a judgment notwithstanding the verdict prior to the trial court entering the above judgment on the jury’s verdict. After a hearing on the motions, the trial court denied Dr. Maumus’ JNOV and granted Mr. and Mrs. Vappie’s JNOV. The trial court adjusted the fault allocation to attribute one hundred percent of the fault to Dr. Maumus and awarded $250,000 for future pain and suffering.
The LPCF then filed a petition for intervention seeking to participate in Dr. Mau-mus’ appeal. Dr. Maumus and the LPCF then filed a suspensive appeal, which was granted, and the trial court stated that neither party had to post a bond. However, following a motion to amend the order for appeal, the trial court ordered Dr. Maumus to post a bond and this appeal followed.

STANDARD OF REVIEW

Appellate courts review findings of fact by the jury using the manifestly ^erroneous or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). As the reviewing court, we must determine if the factfinder’s conclusion was reasonable. Murphy v. City of New Orleans, 09-0567, p. 3 (La.App. 4 Cir. 11/12/09), 25 So.3d 956, 959. “[Wjhere two permissible views of the evidence exist, the factfinder’s choice between them cannot be clearly wrong.” Id. If this Court finds that there is a conflict in the testimony presented to the factfinder, then “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own eval *1126 uations and inferences are as reasonable.” Rosell, 549 So.2d at 844. In regards to conclusions based on witness credibility, “only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Id.
The appellate court can find manifest error when “documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story.” Id. at 844-45. “But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Id. at 845.

MEDICAL MALPRACTICE

Dr. Maumus and the LPCF assert that the trial court committed manifest error by entering a judgment on the jury’s verdict, which found that Dr. Maumus committed malpractice and breached the standard of care and that prednisone caused Mrs. Yappie’s AVN.
 “A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and to use reasonable care, | r,diligence, and judgment.” Cascio v. Downing, 06-0570, pp. 4-5 (La.App. 4 Cir. 4/4/07), 957 So.2d 795, 799. In Louisiana medical malpractice actions the plaintiff must prove:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794. Expert testimony is utilized to assist in proving these elements. Brown v. Tulane Med. Ctr. Hosp. and Clinic, 04-0688, p. 5 (La.App. 4 Cir. 5/9/07), 958 So.2d 87, 90. “Where medical experts express differing views, judgments and opinions, great deference is given to the fact-finder’s determinations” and will not be reversed unless no reasonable factual basis for them exists. Cascio, 06-0570, p. 5, 957 So.2d at 799. “Whether alleged malpractice constitutes negligence is a question for the jury.” Gamino v. Lakeside Hosp., 94-727, p. 15 (La.App. 5 Cir. 2/15/95), 652 So.2d 36, 42.

Medical Review Panel

The MRP found that Dr. Maumus did not fail to meet the applicable standard of care for the following reasons:
1. The prednisone was indicated for the patient’s presenting complaints.
2. Thirty mg of prednisone for one week and the tapered was acceptable.
3. Short courses of systemic corticosteroid therapy are considered safe.
*1127 |,;4. The risk of osteonecrosis in patients receiving steroid therapy is very low.

The Vappies

Mrs. Vappie testified that she was told that she was likely experiencing a miscarriage in August 1996 and she started breaking out with urticaria. Mrs. Vappie stated that she telephoned a nurse, one of her friends, who instructed her to take Benadryl because that is what a doctor advises. She testified that Mr. Vappie was with her the entire time that she was with Dr. Maumus. Mrs. Vappie stated that Dr. Maumus told them both that she had not seen a case like Mrs. Vappie’s since starting to practice medicine. Mrs. Vappie testified that her vital signs were not taken, that her urticaria was improving, and that she was not experiencing any trouble breathing.
Mrs. Vappie stated that Dr. Chad Millet, her treating orthopedic surgeon who performed the bilateral hip replacements, informed her that her AVN was steroid induced. She also testified that she had a left hip replacement surgery in November 1997, and a right hip replacement in 2003, with a pregnancy in between. After the surgeries, Mrs. Vappie stated that she still has back pain, a limp, and other difficulties related to her limited mobility.
On cross examination, Mrs. Vappie attested to taking approximately 270 milligrams of the prescribed prednisone. In regards to her statement that the urticaria was improving, Mrs. Vappie testified that she did not tell Dr. Maumus that her throat felt like it was closing. However, she then admitted that she was cautious about her airway closing. Mrs. Vappie could not remember if she mentioned to Dr. Maumus that she thought the urticaria was caused by a reaction to Chinese food. Mrs. Vappie stated that “I guess she thought it was severe. But I knew that it was going a way [sic].” Following her office visit, Mrs. Vappie sent Dr. Maumus a thank you note indicating that she was the woman experiencing a miscarriage whose airway was closing.
17Mr. Vappie testified that he was in the exam room with his wife the entire doctor’s visit. He also stated that Dr. Mau-mus did not take his wife’s blood pressure or pulse and performed no physical examination or wrote anything down.

Dr. Maumus

Dr. Maumus testified that she had two years of practice when she examined Mrs. Vappie. Contrary to the Vappies’ testimony, Dr. Maumus stated that she examined Mrs. Vappie alone at first, but brought Mr. Vappie in from the waiting room to go over medication instructions. Also converse to the Vappies’ testimony, Dr. Maumus stated that she took Mrs. Vappie’s blood pressure and pulse and indicated that the lack of a written record was an oversight. Dr. Maumus testified that she recalled Mrs. Vappie’s blood pressure was 115/80, pulse of 76, and that her heart had a regular rate and rhythm. Dr. Maumus did not record a respiratory rate. In regards to Mrs. Vappie’s chief complaint, Dr. Mau-mus testified that Mrs. Vappie complained of a rash possibly related to Chinese food. Dr. Maumus stated that Mrs. Vappie also said that she was suffering a miscarriage, experiencing mild shortness of breath, and that her throat felt like it was closing. Overall and contradictory to Mrs. Vappie’s testimony, Dr. Maumus testified that Mrs. Vappie informed Dr. Maumus that she thought her symptoms were worsening. Dr. Maumus observed that Mrs. Vappie “seemed to be breathing fairly comfortably.” Dr. Maumus did not believe that Mrs. Vappie was suffering from active an-gioedema, but was concerned about the earlier alleged symptoms of angioedema that could evolve.
*1128 Dr. Maumus’ examination revealed that Mrs. Vappie had multiple areas of urticaria that were worsening and that Mrs. Vappie informed her that the symptoms were getting worse. No written notes exist to prove the details of Dr. Maumus’ alleged examination. Dr. Maumus’ conclusion was that Mrs. Vappie was suffering from a food or acute anxiety reaction and prescribed prednisone because of Mrs. Vappie’s alleged | ^respiratory complaints, in order to prevent anaphylaxis. Additionally, Dr. Maumus decided that prednisone was needed because Mrs. Vappie previously self-administered Benadryl, but continued to experience the sensation that her throat was closing, the shortness of breath, and acute urticaria that appeared to be progressing with some angioedema. However, Dr. Maumus did not write down angi-oedema in her notes.
Dr. Maumus disagrees with the conclusion that Mrs. Vappie’s AVN was steroid-induced. She told the MRP that steroids were not usually prescribed for urticaria, but that the prednisone was warranted in Mrs. Vappie’s case. Dr. Maumus testified that the benefits of the prednisone outweighed the risks. At the time, she believed that AVN caused by short course steroids was extremely rare. Finally, Dr. Maumus stated that if Mrs. Vappie’s rash was milder, she may not have prescribed prednisone.

Competing Medical Testimony

A portion of Dr. John McGee’s deposition was read to the jury in lieu of live testimony. Dr. McGee, Mr. and Mrs. Vap-pies’ medical expert, stated that the prescription of steroids was not his first choice of therapy for urticaria and that the main treatment for urticaria is antihistamines. Dr. McGee also stated that prescribing prednisone was a deviation from the standard of care even if Dr. Maumus performed a complete physical examination, which showed that Mrs. Vappie’s urticaria was virulent with airway constriction issues, because more antihistamines and epinephrine should have been administered first. His opinion was that Dr. Mau-mus should have tried more antihistamines because the information he possessed demonstrated that the Benadryl improved the urticaria. If Mrs. Vappie presented with respiratory problems or angioedema, then epinephrine should have been prescribed. Dr. McGee believed that prednisone should have been utilized with severe respiratory symptoms, like asthma or bron-chospasm. Dr. McGee also stated that there was no evidence that Dr. Maumus took 19Mrs. Vappie’s vital signs during the office visit. Finally, based on the temporal relationship, Dr. McGee opined that the hip replacements were most likely related to the prednisone.
Dr. Millet testified, through a videotaped deposition, that he had seen patients who ingested fewer steroids than Mrs. Vappie and developed AVN. He concluded that Mrs. Vappie’s AVN was steroid-induced because she did not have any other risk factors. However, Dr. Millet stated that he did not perform an in-depth analysis, but that he did not find any indication that Mrs. Vappie suffered from an autoimmune disease. Further, Dr. Millet testified that he would not prescribe predni-sone for a rash, but that the decision was outside of his expertise.
Dr. Melville Sternberg, a defense expert in internal medicine and a member of the MRP, testified that prednisone is used in a wide variety of situations. Dr. Sternberg stated that the MRP’s decision was unanimous that Dr. Maumus did not breach the standard of care. He found no correlation between small doses of steroids and AVN. Dr. Sternberg also stated that the risk of developing steroid-induced AVN was not increased if the patient was pregnant. Dr. Sternberg agreed with Dr. McGee that *1129 steroid usage for urticaria was not routinely necessary, but that, if necessary, short course oral administrations are preferred over injections.
In his opinion, the lack of recorded vital signs from Mrs. Vappie’s office visit did not constitute a deviation from the standard of care. While the depositions were not taken until after the MRP, Dr. Stern-berg testified that he subsequently read them, but his opinion that Mrs. Vappie’s AVN was not steroid induced did not change. Dr. Sternberg testified that Mrs. Vappie’s dosage of approximately 270 milligrams of prednisone was a very low dose. Dr. Sternberg also stated that the actions of Dr. Maumus were correct.
Dr. Merlin Wilson, a defense expert in internal medicine, allergy and | inimmunology, and rheumatology, testified that in most AVN cases, the cause cannot be identified. However, he stated that there was no evidence to support that 270 milligrams of steroids would cause AVN. Dr. Wilson then testified that urticaria was a common reason for prescribing predni-sone. He stated that nothing demonstrated that Dr. Maumus deviated from the standard of care. Dr. Wilson concluded that it appeared that Mrs. Vappie was suffering from giant urticaria and that the administration of epinephrine would have worn off in about thirty minutes. While he does not believe Mrs. Vappie’s AVN was steroid-induced, he acknowledged that some doctors think that only one shot of steroids creates a risk of steroid-induced AVN. Finally, Dr. Wilson stated the scientific articles and data he relied upon indicate that Mrs. Vappie’s AVN was not caused by steroids even though three of her treating physicians allegedly believe that her AVN was steroid-induced.

Breach & Causation

The testimony reflects that the dispute arises as to Dr. Maumus’ examination of Mrs. Vappie and the amount of steroids needed to cause the risk of developing AVN. After considering the testimony regarding the above, the jury then decided whether Dr. Maumus breached the standard of care by prescribing Mrs. Vappie prednisone for urticaria. The record reflects that the medical experts disagreed as to the amount of steroids needed to create the risk of developing AVN. Conflicting opinions also exist as to whether Dr. Maumus breached the standard of care.
Dr. McGee believed that Dr. Maumus breached the standard of care by prescribing prednisone for urticaria and Dr. Millet said that, while it was outside his area of expertise, he would not have prescribed steroids for urticaria. Drs. McGee and Millet also believed that Mrs. Vappie’s AVN was steroid-induced. Given the competing medical testimony, we cannot find that the jury erred in finding that Dr. 1n Maumus breached the standard of care and that Mrs. Vappie’s AVN was caused by the prednisone.

JNOV

Dr. Maumus and the LPCF contend that the trial court committed legal error by awarding $250,000 for future pain and suffering because the jury’s verdict provided $250,000 for pain and suffering without a past or future designation.[3]
“A JNOV is a procedurally correct device for raising an unreasonable damage award.” Verret v. Carline, 93 0508, p. 3 (La.App. 1 Cir. 3/11/94), 634 So.2d 37, 39. “A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party *1130 that the court believes that reasonable men could not arrive at a contrary verdict.” Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829, 832 (La.1991). The reviewing court “should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.” Id. First, the reviewing court must evaluate whether the trial court erred by granting the JNOV. Davis v. Wal-Mart Stores, Inc., 00-0445, p. 5 (La.11/28/00), 774 So.2d 84, 89; Torrejon v. Mobil Oil Co., 03-1426, p. 5 (La.App. 4 Cir. 6/2/04), 876 So.2d 877, 885. Second, if the trial court properly granted the JNOV, the appellate court reviews the JNOV utilizing the manifest error standard of review. Torrejon, 03-1426, p. 5, 876 So.2d at 885.
The trial judge charged the jury regarding damages and the pertinent portion follows:
[Y]ou should consider general damages and special damages. By general damages we mean a sum of money in which you feel would fairly compensate the plaintiff for the pain, suffering, mental anguish, and disability which she has suffered or will probably suffer in the future as a result of the fault of the defendant.
_Il2- • • ’
The law does recognize that the length of time that pain and suffering and mental anguish will last and the degree of its severity cannot be divorced from a determination of how much it is worth. Therefore, it is permissible for you to consider the intensity and duration of the pain and suffering in determining your award. (Emphasis added).
The jury interrogatories did not delineate between past and future pain and suffering. The jury verdict form interrogatories, in regards to pain and suffering, read as follows:
4. If you answered “yes” to the preceding question, state the amount of damages, if any, to be awarded to the plaintiff for:
Past Medical Expenses
Lost Wages_
Pain And Suffering_
Loss of Enjoyment of Life
In relation to past and future damages, the verdict form included a separate interrogatory for future medical expenses.
Mr. and Mrs. Vappie allege that the jury erred by not awarding damages for future pain and suffering.[4] However, the jury was not asked to award separate damages for past and future pain and suffering. Instead, the verdict form permitted a general allotment for pain and suffering. The jury thusly awarded $250,000 for pain and suffering.
Resolving all inferences in favor of the non-moving party, we find that reasonable men could differ as to the amount of pain and suffering damages Mrs. Vappie should be awarded. Given the record before this Court, the jury was instructed to consider “the pain, suffering, mental anguish, and disability which she has suffered or will probably suffer in the future.” Thus, when the jury awarded $250,000 for pain and suffering, if it followed the trial court’s jury charge, the award included past and future pain and suffering. Accordingly, we find that the trial court erred when it granted Mr. and Mrs. 113Vappie’s JNOV by awarding $250,000 for future pain and suffering and reverse.

*1131
DECREE

For the above mentioned reasons, we find that the trial court did not commit manifest error by entering a judgment on the jury’s verdict and affirm in part. However, we find that the trial court committed a legal error by granting Mr. and Mrs. Vappie’s JNOV to award $250,000 for future pain and suffering and reverse in part.
AFFIRMED IN PART; REVERSED IN PART.

. Urticaria is more commonly known as hives.

. Avascular necrosis is also referred to as osteonecrosis.

. Dr. Maumus and the LPCF did not appeal the reallocation of one hundred percent fault.

. The record is devoid of evidence that Mr. and Mrs. Vappie objected to the jury charge or to the substance of the jury verdict form interrogatories.